TAB

A

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E.    )
(RICK) HALL,    )
    )
    Plaintiffs,    )
    )
vs.    )    CASE NO.: CV-2005-124
    )
CAPITOL RECORDS, INC.; EMI GROUP, INC.;  )
EMI RECORDS; EMI MUSIC INC.; EMI GROUP )
NORTH AMERICA, INC.; PEGASUS RECORDS;)
SUNBURST RECORDS; LASER'S EDGE; BAY  )
SOUND, INC.,; THE SOUND SHOP, INC.;    )
SOUND SHOP; CHARLEMAGNE RECORD    )
EXCHANGE; et al    )
    )
    Defendants.    )

## PLEADING INDEX

| NO. | DATE | DESCRIPTION |
|---|---|---|
| 1 | 03/18/05 | Complaint |
| 2 | 03/18/05 | Summons |
| 3 | 3/18/05 | Notice of Service of Discovery Documents |
| 4 | 03/29/05 | Court Notice – Defendant Capitol Records Served by Certified Mail on 3/23/05 |
| 5 | 03/29/05 | Court Notice- Defendant Sunburst Records Served by Certified Mail on 3/22/05 |
| 6 | 03/29/05 | Court Notice – Defendant Charlemagne Records Served by Certified Mail on 3/22/05 |
| 7 | 03/31/05 | Court Notice- Defendant EMI Group North America Served by Certified Mail on 3/23/05 |
| 8 | 03/31/05 | Court Notice- Defendant EMI Music Inc. Served by Certified Mail on 3/23/05 |
| 9 | 03/31/05 | Court Notice- Defendant EMI Records Served by Certified Mail on 3/23/05 |
| 10 | 03/31/05 | Court Notice- Defendant EMI Group Inc. Served by Certified Mail on 3/23/05 |
| 11 | 04/08/05 | Court Notice- Defendant Pegasus Records Served by Personal Service on 3/30/05 |
| 12 | 04/15/05 | Court Notice – Defendant Laser's Edge Served by Personal Service on 3/29/05 |

1

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E.
(RICK) HALL,

     PLAINTIFFS,

VS.

*1*-CAPITOL RECORDS, INC.; *2* EMI GROUP, INC.;
*3* EMI RECORDS; *4* EMI MUSIC, INC.; EMI GROUP
    NORTH AMERICA, INC.; *6* PEGASUS RECORDS;
*7* SUNBURST RECORDS; *8* LASER'S EDGE; *9* BAY
    SOUND, INC.; *10* THE SOUND SHOP, INC.; *11* SOUND
    SHOP; *12* CHARLEMAGNE RECORD EXCHANGE,
    INC., and DEFENDANTS A, B, C, and D, as more
    specifically described in the body of the Complaint,

     DEFENDANTS.

CASE NO.: CV-2005-124 NVH

PHILLIP BOWLING
CIRCUIT COURT CLERK
2005 MAR 18 PM 3: 43
FILED IN OFFICE

# **COMPLAINT**

    1.    The plaintiff, FAME Enterprises, Inc. ("FAME"), is an Alabama corporation with its

principal place of business in Colbert County, Alabama. The plaintiff, FAME Enterprises, Inc. was

previously known as FAME Production, Inc. Plaintiff, Roe E. (Rick) Hall, ("Hall"), is a resident

of the Colbert County, Alabama. The plaintiff, FAME, is the owner of masters hereafter described,

all of which were initially fixed prior to February 15, 1972, and accordingly are subject to protection

under state law until federal copyright protection preempts state law protection on February 15, 2047.

The plaintiff Hall is the producer of all of said masters. The defendant, Capitol Records, Inc.

("Capitol"), is a foreign corporation with its principal place of business in California. The

defendants, EMI Group, Inc., EMI Records, EMI Music, Inc., and EMI Group North America, Inc.,

(collectively and singularly referred to as "EMI"), are corporations organized under the laws of

another state with their principal place of business in New York.

2.     Capitol is a direct and/or indirect subsidiary of EMI. EMI, Capitol, and Defendants A, B, C, and/or D, together using divisions or labels or agents such as Honest Jons Records and Astralwerks, have acted without authority to release masters owned and produced by the plaintiffs recorded by the artist Candi Staton ("Staton") and Willie Hightower ("Hightower") in several different formats, including, but not limited to, the following Staton performances:

1.     I'm Just a Prisoner (of Your Good Lovin')
2.     Evidence
3.     I'd Rather be an Old Man's Sweetheart (Than a Young Man's Fool)
4.     Someone You Use
5.     That's How Strong My Love Is
6.     Another Man's Woman, Another Woman's Man
7.     He Called Me Baby
8.     Sweet Feeling
9.     Do Your Duty
10.    Stand by Your Man
11.    Heart on a String
12.    Too Hurt to Cry
13.    You Don't Love Me No More
14.    Mr. and Mr. Untrue
15.    How Can I Put Out the Flame (When You Keep the Fire Burning)
16.    To Hear You Say You're Mine
17.    What Would Become of Me
18.    Get It When I Want It
19.    Freedom is Beyond the Door

3.     These masters were released on an album and also on a compact disc entitled "Candi Staton" consisting of 26 masters, 18 of which are owned by FAME.

4.     The following masters owned by the plaintiffs reflecting performances of Willie Hightower have been released by Capitol, EMI, Defendants A, B, C, and/or D:

1.     Walk a Mile in My Shoes
2.     Back Road into Town
3.     You Used Me Baby

2

4. Time Has Brought About a Change
5. Poor Man
6. I Can't Love Without You

5. The above-stated releases occurred in 2004 and 2005. Plaintiffs fear that based on these Defendants' conduct, these and other masters owned by the plaintiffs have been exploited on other occasions without their knowledge and permission.

6. The defendants, Pegasus Records, Sunburst Records, Laser's Edge, Bay Sound, Inc., Sound Shop, The Sound Shop, Inc., and Charlemagne Record Exchange, Inc., (collectively and singularly referred to as "retail seller defendants"), are all Alabama entities who have sold and are likely to sell again in violation of the plaintiffs' rights some of the above-described masters. Upon information and belief, one or more of these defendants knew or should have known of FAME's rights in said masters and/or Capitol and EMI's wrongful misappropriation thereof before selling them to the public. At least the Sound Shop, The Sound Shop, Inc., and Laser's Edge currently have in stock compact discs wrongfully containing the above-described masters, and the other retail seller defendants have carried them in stock from time to time and/or sold them to the public. These retail seller defendants are sued in this Complaint for injunctive relief preventing the future sale of plaintiffs' masters, for an accounting of proceeds received from prior sales, and for recovery of all compact discs or albums containing plaintiffs' above-described masters.

7. The defendants, EMI, Capitol, and Defendants A, B, C, and D have with actual knowledge of plaintiffs' ownership rights and after explicitly acknowledging plaintiffs' ownership rights and being explicitly warned to not violate plaintiffs' ownership rights, have intentionally, wantonly, recklessly, and/or negligently trampled plaintiffs' rights by asserting ownership of, distributing the above-described masters and/or licensing for distribution to others the above-

3

described masters, reaping for themselves the profits of plaintiffs' ownership and creative excellence. These Defendants have used plaintiffs' name, reputation, and trademark to promote said masters, usurping plaintiffs' goodwill therein.

8. On May 6, 1969, Capitol Records, Inc. and FAME Productions, Inc., n/k/a FAME Enterprises, Inc., entered into the contract, attached hereto as Exhibit "A." On August 26, 1970, the same parties entered into the contract, attached hereto as Exhibit "B." All the masters described above were recorded under these two contracts. Pursuant to these contracts plaintiffs created and produced master recordings in the rhythm and blues fields to be marketed on the "FAME" label and distributed by Capitol. Both of said contracts contained a repurchase provision in favor of FAME permitting it to buy back for the nominal consideration of One Dollar ($1.00) all the masters delivered under said contracts. In substance and effect, the masters delivered under these contracts were delivered pursuant to a lease, and ownership reverted to FAME at the end of said lease and/or remained with FAME throughout. Furthermore, on June 17, 1971, FAME wrote to Capitol Records, Inc. notifying it of the exercise of the repurchase rights in said contracts. Said letter is attached hereto as Exhibit "C." In 1971 management of FAME and Capitol agreed that ownership of said masters reverted to FAME. Since this time agents and employees of Capitol and EMI have repeatedly acknowledged and confirmed FAME's ownership of masters recorded under the above-described agreements, including the masters listed above. At no time has Capitol or EMI contested or challenged FAME's ownership of the masters or provided any documentation to dispute said ownership.

9. For example, in May 1994, CEMA Special Markets, a division of Capitol, planned to release a compilation of masters referred to as "Soul Patrol." Upon learning of this and the

4

planned inclusion of "Stand by Your Man" by Candi Staton on said compilation, FAME asserted its ownership to said master and received back the letter dated May 16, 1994, attached hereto as Exhibit "D", from Dawn Van Patten, with CEMA Special Markets, stating as follows:

> We have no contention to the ownership of the Candi Staton track and agree to the licensing in full understanding of FAME's ownership.

Thereafter, by letter dated December 9, 1994 (attached hereto as Exhibit "E"), CEMA Special Markets forwarded a fully executed agreement (Exhibit "F") in which it licensed from FAME, because of FAME's ownership, the master "Stand by Your Man" performed by Candi Staton, which is one of the same masters that Capitol and EMI have now released in violation of plaintiffs' rights. The license to use the master of "Stand by Your Man" was specifically limited to the compilation entitled "Soul Patrol," and expired on June 30, 1996. See Exhibit "F", Paragraph 2.01.

10. On May 10, 1996, Capitol and EMI, acting through their division EMI-Capitol Music Special Markets, again admitted FAME's ownership of the Candi Staton master "Stand by Your Man" by renewing the above-described license for two additional years through June 30, 1998, for limited use in the "Soul Patrol" compilation, attached hereto as Exhibit "G."

11. On October 29, 1996, the plaintiff Hall received the letter attached hereto as Exhibit "H" from EMI seeking permission to release 16 tracks owned by FAME performed by Candi Staton using original artwork from one of the FAME albums on Candi Staton. By virtue of the letter attached hereto as Exhibit "I," FAME responded through counsel informing EMI of FAME's ownership of all, except six of the masters proposed to be released by EMI, and providing documentary evidence of said ownership, as well as EMI and Capitol's previous acknowledgment of said ownership. Obviously recognizing FAME's ownership, EMI elected not to release said

5

masters without FAME's permission at that time.

12, On March 11, 1999, after having heard of EMI's plan to release a compilation of Candi Staton performances containing numerous masters owned by FAME, FAME sent the letter attached as Exhibit "J" to EMI in the United Kingdom protesting said proposed use and informing EMI again of FAME's ownership. Again, EMI acknowledged FAME's ownership rights. By way of letter dated March 15, 1999, attached hereto as Exhibit "K," EMI acknowledged receipt of the above-described letter, and promised to "revert once I have spoken" to others regarding the "failure to license" and the pertinent "background." In response to these communications and its investigation of the "background," on March 17, 1999, EMI Business Affairs wrote to FAME (Exhibit "L") seeking permission to license 26 masters performed by Candi Staton from FAME for release of "an album devoted to Candi Staton's years with the 'FAME label' provisionally entitled 'Southern Soul Masters'." Nineteen of these same masters are included on the album and compact discs which EMI and Capitol have now released in violation of FAME's rights.

13. By letter, attached hereto as Exhibit "M," dated March 19, 1999, FAME rejected permission to license the masters owned by FAME performed by Candi Staton under the terms and conditions proposed by EMI. FAME did not "believe a mid-priced CD would be advantageous to FAME" and pointed out that the "material is some of the best material in our small catalogue." FAME also asserted that the masters had particular value because they had never been released on CD.

14. Now, after acknowledging FAME's ownership of the masters recorded at FAME under the contracts represented by Exhibits "A" and "B,"and having acknowledged FAME's ownership by actually requesting a license for those same masters from FAME, EMI, Capitol, and

6

Defendants A, B, C, and D have elected to release said masters and distribute the same without regard to FAME's legal rights. Additionally, while all of the above-described correspondence pertains to masters performed by Candi Staton, the masters performed by Willie Hightower are governed by the same contracts and EMI and Capitol's acknowledgment of the ownership of the Staton masters is equally an acknowledgment of FAME's ownership of all masters recorded under the contracts attached as Exhibits "A" and "B."

15.    Capitol, EMI, and Defendants A, B, C, and D have usurped and damaged plaintiffs' ownership rights, and the value of the same capitalizing on these masters' lack of availability on the commercial market, resulting in their ever increasing value. The liner notes to the "Candi Staton" CD states:

> Sometime records attain legendary status because they've been long unavailable and to hear them you have to part with a week's wages for a dusty slab of vinyl. Their status is derived from their scarcity as much as their quality. Some records though are as precious as they are rare. Candi Staton is a case in point. There aren't many old soul records as highly regarded, yet as elusive as the singles and albums that Candi recorded for FAME Records of Muscle Shoals, Alabama, but one listen to the sides she cut there and you'll know that these records deserve all their acclaim and more.
>
> There's little in the soul canon that matches the strength and beauty of the work Candi produced during her six years recording at FAME.

16.    Capitol, EMI, and Defendants A, B, C, and D explicitly trafficked on and exploited the plaintiffs' trademark and reputation in its marketing of the "Candi Staton" CD. For example, the liner notes on the CD state:

> Rick Hall, owner of FAME Records, was looking for a female blues singer at the time, someone with whom he could duplicate the success he'd had recording Etta James and hits like I'd Rather Go Blind, and Tell Mama. Muscle Shoals had become as import as Memphis in the

7

world of southern soul. Memphis had Stax, but Muscle Shoals had FAME (which stood for Florence Alabama Music Enterprises). As a record label FAME could not match Stax, but as a recording studio it was at least its equal, with a pool of musicians and songwriters as strong as anywhere. Aretha Franklin recorded some of her greatest sides there, and Wilson Pickett cut classics like Hey Jude and I'm In Love at the studio. Candi couldn't have found a better setting. . . .

The records Candi made at FAME are some of the finest examples of what is known now as southern soul. Tough, funky, dirty, soulful and proud, they still sound immense today. The sound is more complex than the hits that previously come out of other southern studios like Stax. Rick Hall's production is strong and driving, the band metallic and harsh, especially on the faster numbers. When the band eases up for the ballads the playing is precise and intelligent. There's not a single note wasted or out of place. You can hear the understanding between band and singer. You can hear the pleasure they must have taken in their work.

17.     Ironically, Capitol and EMI characterize their very conduct as amounting to theft.

The liner notes on the "Candi Staton" CD state:

Please remember that this recording and artwork are protected by copyright law. Since you don't own the copyright, it's not yours to distribute. Please don't use internet services that promote the illegal distribution of copyrighted music, give away illegal copies of discs or lend discs to others for copying. It's hurting the artists who created the music. It has the same effect as stealing a disc from a store without paying for it.

18.     While incorrect in asserting that the masters at issue are protected by federal copyright law, EMI and Capitol well know that state misappropriation laws, including record piracy statutes advanced by the record industry to protect pre-February 15, 1972, sound recordings, make it illegal to sale or distribute masters that you do not own. EMI and Capitol thus have knowingly stolen the plaintiffs' property rights based upon their own characterizations.

8

## COUNT I
### (Record Piracy)

19.    Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 18.

20.    Under Ala. Code § 13A-8-85(a) and (b) the plaintiffs assert claims for the illegal reproduction of their masters and/or violation of the provisions of Ala. Code § 13A-8-80, *et seq.*, as alleged above against Capitol, EMI, and Defendants A, B, C, and D, and seek actual, compensatory, and incidental damages, including emotional distress damages for the plaintiff Hall, as well as punitive damages from the defendants, Capitol, EMI, and Defendants A, B, C, and D.

21.    Plaintiffs, as more specifically described in Count VIII, seek injunctive relief and an accounting from the retail seller defendants and all other defendants under Ala. Code § 13A-8-80, et seq.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against defendants, Capitol, EMI, and Defendants A, B, C, and D, for compensatory and punitive damages, including a disgorgement of gross profits or receipts, and against all defendants for an accounting and injunctive relief, and for such other or further relief as plaintiffs may be entitled.

## COUNT II
### (Breach of Contract)

22.    Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 21.

23.    Capitol's contracts represented by Exhibit "A" and Exhibit "B" do not provide it ownership of the masters at issue in this case. Moreover, said contracts contain buy-back provisions

9

in favor of FAME that have been exercised, that evidence only a lease with ownership remaining with FAME, and/or which have been recognized through course of performance, course of dealing, waiver and estoppel as having been exercised in favor of FAME, resulting in its ownership of the masters in question. Further, said contracts limit Capitol's rights to use the name, likeness, trademarks and tradenames of FAME for so long as it is permitted to release the masters, which has long expired.

24. Capitol has breached the above-described contractual obligations, causing the plaintiff FAME compensatory damages.

WHEREFORE, the plaintiff FAME requests judgment against Capitol for such compensatory damages as a jury shall assess.

## COUNT III
### (Claim Under Ala. Code § 6-5-260)

25. Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 24.

26. The defendants, Capitol, EMI, and Defendants, A, B, C, and D have deprived and/or interfered with plaintiffs' possessory rights, and rights to use, exploit and distribute the above-described masters, trademark, artwork, and goodwill causing plaintiffs compensatory damages, and under circumstances justifying the award of punitive damages.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against the above-named defendants for such compensatory and punitive damages as a jury shall assess.

## COUNT IV
### (Claim Under Ala. Code § 6-5-262)

27.     Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 26.

28.     The defendants, Capitol, EMI and Defendants A, B, C, and D have abused and/or damaged unlawfully the plaintiffs' property represented by the masters, its trademark, artwork, and goodwill causing the plaintiffs compensatory damages and under circumstances justifying an award of punitive damages.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against the above-named defendants for such compensatory and punitive damages as a jury shall assess.


## COUNT V
### (Conversion)

29.     Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 28.

30.     The defendants, Capitol, EMI, and Defendants A, B, C, and D have engaged in a wrongful taking, a wrongful detention, an illegal use or misuse of plaintiffs' masters, trademark, artwork, and goodwill, causing compensatory damages to the plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against the above-named defendants for such compensatory and punitive damages as a jury shall assess.

## COUNT VI
### (Complaint for Recovery of Chattels in Species)

31.     Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 30.

32.     One or more compact discs and/or albums from plaintiffs' masters are and/or have been in the possession of each of the defendants. The plaintiffs claim possession from each of the defendants of said property pursuant to plaintiffs' ownership rights in said masters and the illegal distribution and copying of the same. Under Ala. Code § 13A-8-85, the retail seller defendants' lack of knowledge or intent as to the violation of plaintiffs' rights does not permit said defendants to maintain possession of said compact discs or albums, or to retain profit from the sale of compact discs or albums containing FAME's masters.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against each defendant, separately and severally, for the recovery of the property, or, in the alternative, the value thereof, damages for the detention thereof, an accounting for profits, and injunctive relief precluding the future wrongful exploitation of plaintiffs' property.

## COUNT VII
### (State Statutory and Common Law Unfair
### Competition/Palming Off Claim)

33.     Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 32.

34.     Since the early 1960's the plaintiff FAME and its controlled subsidiaries and affiliates have used the tradename "FAME," developing an international reputation for excellence in the

12

creation of sound recordings such as the masters in question, particularly, soul or rhythm and blues music. Said tradename has become a protected trademark under Alabama law.

35.     The actions of the defendants, Capitol, EMI, and Defendants A, B, C, and D herein in utilizing FAME's trademark in association with the compact discs or albums at issue has been designed to and, in fact, has confused the public regarding the origin, approval or sponsorship by FAME of said goods. The retail seller defendants have sold and are likely to sell in the future compact discs infringing plaintiffs' trademark and other rights unless restrained.

36.     Defendants, Capitol, EMI, and Defendants A, B, C, and D have misappropriated FAME's trademark, and FAME and Hall's reputation, relations, and goodwill so as to profit at plaintiffs' expense, all the while devaluing plaintiffs' masters, trademark, goodwill and reputation.

37.     These defendants have accordingly engaged in unfair methods of competition causing plaintiffs to suffer actual damages in an amount that cannot be fully calculated at this time.

38.     As a result of these defendants' unfair method of competition, plaintiffs are suffering and will continue to suffer, unless those unfair methods are enjoined, irreparable harm as a result of these wrongful actions.

39.     These defendants' conduct creates a likelihood of injury to business reputation or of dilution of the distinctive quality of plaintiffs' trademark in violation of Ala. Code § 5-12-17, entitling plaintiffs to injunctive relief as well as damages.

40.     The wrongful conduct of Defendants, Capitol, EMI, and Defendants A, B, C, and D described in this Count was committed under circumstances justifying an award of punitive damages under Alabama law.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against defendants,

13

Capitol, EMI, and Defendants A, B, C, and D, for compensatory and punitive damages, including a disgorgement of gross profits or receipts, and against all defendants for an accounting and injunctive relief, and for such other or further relief as plaintiffs may be entitled.

## COUNT VIII
### (Claim for Injunctive Relief, Accounting, and Other Equitable Relief)

41.     Plaintiffs adopt and re-allege the prior allegations hereinabove contained in paragraphs numbered 1 through 40.

42.     The claims stated heretofore permit plaintiffs to obtain injunctive relief precluding the further copying, distribution, sale, and dissemination of compact discs or albums containing their masters or trademark, an accounting from anyone who has engaged in said activities, and for other equitable relief. Each of the defendants has engaged in or is likely in the future to engage in such activities unless enjoined by the Court.

43.     Plaintiffs are at a substantial risk of not having an adequate remedy at law and/or will suffer irreparable harm if an injunction is not entered, or are otherwise entitled to injunctive relief because of the unique nature of plaintiffs' masters and other rights.

WHEREFORE, plaintiffs request the following:

A.     That the defendants, separately and severally, be enjoined from copying distributing, selling, or disseminating any compact disc or album containing any of the plaintiffs' masters reflecting performances of Candi Staton or Willie Hightower, or other masters owned by the plaintiffs, described herein or otherwise using the plaintiffs' trademark without permission.

B.     That an Order be entered requiring the defendants to render an accounting of

14

all revenues and profits derived from the sales of compact discs or albums containing plaintiffs' masters described herein and containing its trademark, "FAME."

C. That defendants be required to disgorge gross profits or receipts.

D. An award of such other and further relief as the Court deems appropriate.

G. RICK HALL (HAL043)
Hall & Tanner, P.C.
Attorneys for the Plaintiffs
201 North Water Street
Tuscumbia, Alabama 35674
(256) 381-7750

**PLAINTIFFS DEMAND TRIAL BY STRUCK JURY OF THIS CAUSE.** Plaintiffs further request service on the defendants by way of Certified Mail, Return Receipt Requested at the following addresses:

Capitol Records, Inc.
c/o James M. Scott or Lister L. Hill
57 Adams Avenue
Montgomery, Alabama 36104-4001

EMI Group, Inc.
304 Park Avenue South
New York, New York 10010

EMI Records
304 Park Avenue South
New York, New York 10010

EMI Music, Inc.
304 Park Avenue South
New York, New York 10010

15

EMI Group North America, Inc.
304 Park Avenue South
New York, New York 10010

Pegasus Records
612 East Tennessee Street
Florence, Alabama 35630

Sunburst Records
4001 Holmes Avenue NW
Huntsville, Alabama 35816-4121

Laser's Edge
2825 18th Street South
Homewood, Alabama 35209-2509

Bay Sound, Inc.
c/o William J. Francis III
221 Highway 90, Suite 108
Daphne, Alabama 36526

Sound Shop
Quintard Mall
700 Quintard Drive
Oxford, Alabama 36203

The Sound Shop, Inc.
Quintard Mall
700 Quintard Drive
Oxford, Alabama 36203

Charlemagne Record Exchange, Inc.
c/o Gary Bourgeois
1924½ 11th Avenue South
Birmingham, Alabama 35205

_____

G. RICK HALL (HAL043)
Hall & Tanner, P.C.
Attorneys for the Plaintiff
201 North Water Street
Tuscumbia, Alabama 35674
(256) 381-7750

16

# EXHIBIT "A"

Contract No. 4842

Los Angeles, California

Date: MAY 6 1969

A-G-R-E-E-M-E-N-T

Capitol Records, Inc.
1750 North Vine Street
Hollywood, California 90028

Gentlemen:

This will confirm the Agreement between Capitol Records,
Inc. (called "Capitol") and Fame Productions, Inc. (called
"Company").

Company is in the business of producing master recordings
(called "Masters") in the rhythm and blues music field. Company
will continue to operate such business for the mutual benefit
of Capitol and Company during the term hereof on the following
terms:

1. TERM

The term of this Agreement shall consist of (i)
an initial period commencing on the date hereof and ending
one year after release of the first record made up from masters
produced hereunder, and (ii) four one year option periods.
The option periods shall follow consecutively after the ter-
mination of the initial period. Each option may be exer-
cised by Capitol's giving Company written notice thereof
at least 30 days prior to the expiration of the then cur-
rent period. Each option period shall be on all the same
terms as apply to the initial period except as otherwise
specified herein. The initial period is sometimes herein

FPI-RH

referred to as the "first year" of the term or by some similar
phrase notwithstanding said initial period may be longer than
one year.

## 2. COMPANY'S ARTISTS

Company agrees to have contracts with at least 3 Artists
each year of the term hereof for purposes of delivering masters
to Capitol hereunder.

a.   Notwithstanding the foregoing so long as Company's
services are exclusive to Capitol as provided in this Section
2., (i) all Artists hereafter coming under contract to Company
shall be produced by Company subject to the terms of this Agreement,
and (ii) Company shall not produce any Artist nor authorize
manufacture or distribution of records from any masters embodying
performance of an Artist except pursuant to the terms of this
Agreement provided that Company may continue to produce the 7
artists (identified in Exhibit "C" hereto) which Company is now
producing; further provided that Company may from time to time at
any time during the term of this agreement substitute another
artist for one of the 7 artists provided that such substitute
artist is an "established" artist (i.e., an artist who has had
a record in the top 80 of either the "Hot 100" or the "Top 100"
Charts of "Billboard Magazine" or "Cash Box" Magazine or in the
top 40 of the Rhythm and Blues charts in either of said publi-
cations).

b.   If gross Contingent Payments which accrue to
Company's account under this Agreement do not, for actual sales
in the period set forth in the Contingent Payments Table set
forth below, equal or exceed the amount set forth beside each
such period in the Table, as of the end of such period the restric-
tions on Company set forth in Paragraph 2.a., above will be
inoperative except that Company shall continue under this Agree-
ment to produce those artists who have been produced pursuant

Page -2-

to this Agreement for the duration of their contracts at Capitol's option and Company shall continue to produce at least 3 artists for Capitol under the terms hereof. Otherwise Company shall be free to produce artists not subject to this Agreement for anyone it chooses. Additionally if the restrictions in Paragraph 2.a., above cease to bind Company as herein provided, the minimum number of masters called for in Section 3., below shall be reduced from 24 to 18 or more at Capitol's election, but not more than 24 without Company's consent.

### CONTINGENT PAYMENTS TABLE

| | |
|---|---|
| Initial Period | $150,000.00 |
| 1st Option Period | $250,000.00 |
| 2nd Option Period | $350,000.00 |
| 3rd Option Period | $450,000.00 |

c.    Notwithstanding the foregoing, if the Contingent Payments which accrue in any period from actual sales shall be less than the amount shown in the Table above for such period, Capitol may pay Company the difference and thus prevent the obligations of Company under Paragraph 2.a. above from ending, provided that Capitol may not prevent such obligations from ending if the amount of the difference between Contingent Payments from actual sales and the amount set forth in the Table above is greater than 10% of the amount set forth in the Table above for that period.

3.    MASTER BUDGET OBLIGATION

Utilizing the services of at least 3 Artists, Company will produce at least 24 masters for Capitol each year of the term hereof.

a.    Capitol will pay Company (upon submission of paid bills, AFM Form "B" contracts and other union contract forms required, all in Company's name) its actual costs incurred in producing each such master, but not, without Capitol's consent, more than $2,000.00 per master. Company may produce more than 24 masters per year for Capitol and Capitol will

pay Company its actual cost of producing each such master
but, without Capitol's written consent, not more than $2,000.00
per master, provided that subject to Section 4.b., below,
Capitol's total obligation (called "Budget Obligation") hereunder
shall not exceed $133,000.00 for the first year of the term
hereof.

b. The term "costs" as used in Paragraph 3.a.,
above includes all costs of musicians, singers, arrangers,
copyists, cartage, instrument rentals, studio editing, mixing,
tape, artist transportation costs to the point of recording,
and artist's living costs, all when necessarily paid by Company.

c. For each option period which becomes operative
hereunder, Capitol's Budget Obligation under this Section
3. shall be $133,000.00 plus an amount equal to 50% of the
amount of Contingent Payments accruing to Company hereunder
in the immediately preceding period in excess of $150,000.00,
provided that Capitol's Budget Obligation hereunder for any
year shall not exceed $266,000.00.

d. The minimum 24 masters to be delivered to Capitol
hereunder in each period of the term must be delivered to
Capitol as follows: (i) eight masters for release as 4 single
records not later than the end of the 6th month of the relevant
period; (ii) 10 additional masters for release as five single
records not later than the end of the 9th month of the relevant
period and (iii) the balance not later than the end of the
11th month of the relevant period. If this contract becomes
non-exclusive within the meaning of Section 2. above and if the
minimum number of masters per period is 18, they shall be

FPI RH

delivered in the same schedule as above except that the number
of masters to be delivered in each case shall be reduced by
2.

### 4. ALBUMS

If a single record of any Artist reaches the top
40 of the "Hot 100" chart in "Billboard" Magazine or the "Top
100" chart in "Cash Box" Magazine, Company shall have the
right to produce sufficient additional masters, in Company's
judgement, to constitute an album and deliver such masters
to Capitol for release as an album and Capitol will release
such album.

a. If a single record of any Artist reaches the
top 20 of either one of the aforesaid charts, Capitol may
ask Company to produce sufficient additional masters, in Capitol's
judgment, to constitute an album and Company will promptly produce such
masters and deliver them to Capitol.

b. The limits on Capitol's Budget Obligation for
masters produced in any period shall apply to masters produced
for albums pursuant to this Section 4. provided that the amount
paid by Capitol for masters in such an album or produced be-
cause of a written request from Capitol for production of
such masters, shall not be counted as part of the Budget Obligation
to the extent that to count the amount paid for album masters
would make the total amount expended by Capitol (for albums
and single records) equal or exceed the Budget Obligation
for the relevant year.

### 5. MASTER TAPES

Company will send Capitol final stereo and monaural
tape masters of each recording and Capitol will send Company

FPI RH

3 proof reference discs of each single record made hereunder for approval or disapproval. If Company fails to approve or disapprove such proof reference discs within 10 days after Capitol sends them to Company by air mail, Capitol may deem all of such discs approved and select any one Capitol wishes. Company may designate the time of release of single records and albums provided that Capitol must have at least 21 days notice for release of a single record and 60 days notice (after Company has approved the cover and liner) for release of an album.

6. COVERS AND LINERS

Company shall have the right to approve or disapprove covers and liners of 33-1/3 rpm disc type albums to be released on Company's label. For this purpose Capitol will send camera ready finished art for each cover and a velox copy of each liner to Company. If Company has not disapproved a cover or liner within 10 days after Capitol sends such material to Company by air mail, such cover or liner shall be deemed approved.

7. PAYMENTS

Conditioned upon the full and faithful performance of each and all of the provisions of this Agreement by Company which are to be performed by Company Capitol agrees to pay Company in connection with records manufactured from masters purchased hereunder a Contingent Payment, subject to the provisions below, of 24% in connection with records manufactured in the USA and 6% with respect to records manufactured outside the USA.

a. Contingent Payments hereunder shall be computed

Page -6-

and paid in the manner prescribed in Addendum No. 2 annex-
ed hereto, which Addendum constitutes an integral part here-
of.

b.   If the price upon which Capitol computes dis-
tributor discounts for the Capitol label (which price is
also sometimes referred to as the suggested retail price)
increases or decreases, then the prices upon which Contingent
Payments are to be computed hereunder shall, for purposes
of computing Contingent Payments, increase or decrease pro-
portionately.

8.   ADVANCES RECOVERABLE

All payments by Capitol to Company under Section
3. above shall be deemed advances recoverable by Capitol from
Contingent Payments payable to Company in connection with any
masters embodying the performance of the Artist whose performance
is embodied in the master in connection with which Capitol made
such payment.  If Capitol is required to pay any sales or use
tax in connection with any of the masters recorded hereunder,
the Contingent Payment rate of 24% referred to in Section 7.,
above shall be increased to 25% and if Capitol pays such tax
Capitol shall be entitled to recover such sales or use tax (up
to a total sales or use tax of 5%) from the Contingent Payments
payable to Company in connection with any masters embodying
the performance of the Artist whose performance is embodied
in the master in connection with which Capitol paid or must
pay such sales or use tax.

9.   ARTIST ROYALTIES

Company agrees that if the compensation of any person
in connection with the recording of the masters is based on
a royalty, the obligation to pay such royalty is and shall

remain Company's sole obligation and Company will save Capitol
harmless from any claim by the producer and/or performer in
that connection.

10. PROMOTION PAYMENT

In addition to advances and Contingent Payments
hereunder, Capitol will pay Company $31,080.00 per year of
the term. The first payment of $31,080.00 shall be made within
14·days after the execution of this Agreement. A like sum
shall be paid for each option period which becomes operative
within 14 days after the commencement date of such option
period. Said payment is to enable Company to hire a promotion
man to promote records produced and released pursuant to this
Agreement, to cover such promotion man's salary and expenses,
to enable Company to lease an automobile and for other expenses
Company may wish to incur solely for promotion of records
released pursuant hereto.

11. LABELS

The initial release of all records produced here-
under and released by Capitol during the term of this Agreement
will, in the United States of America and Canada, be on Com-
pany's label in the form of Exhibit "A" hereto. Capitol's
rights and obligations with respect to said label shall terminate
upon the termination of this Agreement and all records thereafter
manufactured from masters subject to the terms of this Agreement
shall be released on the Capitol label or such other label
as Capitol uses for comparable product unless Company elects
to require Capitol to continue to release records of masters
subject hereto on Company's label. If Company does so elect,

so long as Capitol is so obligated to use Company's label, Company shall not itself issue any records on said label or authorize anyone else to issue records on such label.

a.  Company will notify Capitol in writing after the termination of this Agreement whether Company elects to have Capitol continue to use Company's label or not and any such election shall be final. If after the term of this Agreement Capitol requests in writing that Company make such election and Company fails to make such election within 30 days after such request, Company shall be deemed to have elected not to require or allow Capitol to continue using Company's label.

b.  Company represents and warrants that it is the sole owner of the label identified in Exhibit "A" and any trademark thereon and agrees to hold Capitol harmless and to indemnify Capitol against any damages or costs (including reasonable attorney's fees) arising from any claim that said label or trademark infringes the rights of others. Capitol's obligation to use said label and/or trademark shall continue only so long as Capitol's use thereof is without cost to Capitol. Records may be released outside the United States of America and Canada on such label as Capitol's foreign licensees customarily use for like product.

12.  RIGHT TO USE NAME

Company grants to Capitol the right, so long as Capitol has the right to release records of masters produced hereunder, to use and publish and to permit others to use and publish Company's name for advertising and trade purposes in connection with records manufactured from masters which Company produces hereunder.

13. PROMOTION MEN

Capitol agrees to engage the services of 6 promotion men (in addition to the present staff) whose activities in substantial part will be devoted to promotion of records released pursuant to this Agreement.

14. INDEPENDENT DISTRIBUTORS

Capitol agrees that in the distribution of records to be released on Company's label, Capitol will engage the services of 5 independent distributors selected by Company, and doing business in the southern and southeastern part of the United States. Company may select such a distributor in Miami, Florida, New Orleans, Louisiana, Atlanta, Georgia and 2 other cities in the region described. Company understands that Capitol must be entirely free in its relationship with such distributors to require such distributors to perform in a manner consistent with good business practice.

15. ARTIST CONTRACTS

Company covenants that:

a. Each Artist's contract with Company shall provide for a total duration of not less than 3 years. Company will use its best efforts to obtain a total term of not less than 5 years.

b. Each Artist's contract will contain terms substantially covering the points enumerated in Exhibit "B" hereto. Company agrees to enforce such terms for Capitol's benefit. Company agrees not to have any artist who has recorded any selection for masters hereunder, record the same selection for any other record company for at least 5 years after such artist recorded such selection for Company pursuant to this Agreement.

c. The services of each Artist produced by Company pursuant to this Agreement will be made available to Capitol, notwithstanding the termination of this Agreement, from year to year, at Capitol's election, for the duration of such Artist's contract but not more than a total of 5 years including the period such Artist's services are provided during the term of this Agreement. Capitol must give Company at least 30 days notice to exercise each Artist's option prior to the expiration date of the current period of such Artist's contract. Company will provide Capitol with a schedule of such expiration dates not later than the termination of the term of this Agreement.

d. At the time of delivery of a master to Capitol hereunder, each of the representations, warranties and covenants set forth in Addendum No. 1 hereto will be true with respect to such master.

16. **ASSIGNMENT OF ARTIST CONTRACTS**

If at any time during the term of this Agreement, Company decides that it no longer wishes to produce a particular Artist, Company shall give Capitol written notice to that effect. Within 10 days after receipt of such notice, Capitol may give Company written notice that Capitol elects to have Company assign its contract with such Artist to Capitol in which event Company shall so assign such contract and Company shall not be entitled to royalties with respect to any master thereafter produced. If Capitol does not so elect, Company's obligation to continue producing such Artist for Capitol shall terminate. Nothing herein shall relieve Company of its obligation to provide Capitol with the services of and to produce at

least 3 Artists each year during the term of this Agreement.
Any assignment of a contract hereunder by Company shall be subject
to all of Company's obligations in connection with such contract.

17.   BREACH BY ARTIST

Notwithstanding any other provision of this Agree-
ment, Company shall not be responsible for any breach by an
Artist of his contract with Company or the consequences of
such breach, provided that such breach could not have been
prevented by Company.

18.   BUY-BACK

Five years after the initial release by Capitol
of a record manufactured from a master produced hereunder,
Company shall have the right to repurchase such master from
Capitol for the sum of $1.00. If Company desires to repurchase
any such master, Company shall so inform Capitol in writing
identifying the master Company wishes to buy. Capitol shall
promptly deliver to Company the original tape copies of such
master and all of Capitol's rights with respect to such master
shall thereupon terminate except that Capitol may continue,
on all the terms stated herein, to distribute existing inventory
of records of such master for 6 months after such repurchase
by Company. Company's right to repurchase any master produced
hereunder and released by Capitol shall end 7 years after
the last master produced pursuant to Paragraph 15,c. above
is first released by Capitol and Capitol shall thereafter
have complete ownership in perpetuity of any masters not so
repurchased. Capitol may thereafter release records of such
masters on any label owned or controlled by Capitol or a licensee
of Capitol. Company shall have the right at any time during the

two year period after the termination of each Artist's contract as the same may continue after the term hereof to buy back for a purchase price of $1.00 per master any master which has not been released by Capitol.

### 19. PARTY SIGNATORY

Company represents and warrants that it is a Company signatory to the American Federation of Musicians Phonograph Record Labor Agreement, the Special Payments Fund Agreement and the Phonograph Record Trust-Agreement, all of January, 1969 and that Company is a party signatory to the American Federation of Television and Radio Artists National Code of Fair Practice for Phonograph Recordings. Further, if during the term hereof, Capitol signs any successor agreement to the aforesaid agreements with the AFM and/or AFTRA, Company will likewise sign such successor agreements. Capitol will reimburse Company for verified payments made by Company to the AFTRA Pension and Welfare Fund in connection with payments made to Artists for services rendered pursuant to this Agreement.

### 20. NON-DELIVERY BY COMPANY

If Company fails to provide Capitol with tape masters as required in this Agreement, Capitol may either (i) terminate this Agreement as of the date Capitol sends Company written notice to that effect and Capitol's only obligation to Company thereafter shall be with respect to masters theretofore purchased by Capitol hereunder, or (ii) suspend the term of this Agreement until Company has cured its default under this Agreement in which event an amount of time equal to the period of such suspension shall be added to the then current period. Written notice of any such election by Capitol must be given to Company

within the then current period. No termination hereunder
will affect Capitol's obligation to account and pay Contingent
Payments as they accrue hereunder.

21.   FORCE MAJEURE

If at any time during the term hereof by reason
of any act of God, fire, earthquake, flood, explosion, strike,
labor disturbance, civil commotion, act of Government, its
agencies or officers, any order, regulation, ruling or action
of any labor union or association of artists, musicians, composers
or employees affecting Capitol or Company or any subsidiary
or affiliate of Capitol or Company, or the industry in which
it is or they are engaged, or any shortage of, or failure
or delays in the delivery of materials, supplies, labor, or
equipment, or any other cause or causes beyond the control
of Capitol and/or Company, any affiliate or subsidiary, whether
of the same or any other nature, Capitol is unable to press
and/or distribute records manufactured from masters produced
hereunder or Company is unable to produce masters hereunder,
either party may, upon notice to the other, suspend the term
of this Agreement for the duration of any such contingency.
A number of days equal to the total of all such days of sus-
pension shall be added to the then current period and the
commencement of the succeeding periods shall be postponed
accordingly.

22.   DEFINITIONS

a.   The word "person" means a person, firm, or
corporation.

b.   The word "selection" means a single musical
composition (including a medley), story, poem or similar work,
irrespective of length.

Page -14-

c. The word "master" means any original recording which embodies a performance by Artist.

d. The noun "record" means any device by which sound may be recorded for later transmission to listeners, whether now known or unknown and howsoever used, ~~whether embodying~~ _FPI-RH_ ~~sound alone or sound synchronized with or accompanied by visual images of Artist or another subject.~~ The noun "record" does not include a "master" as defined above.

e. The words "single record" mean a disc type record with one selection on each side, each selection being usually of a playing time not exceeding three minutes and thirty seconds.

f. The word "album" means a record other than a single record.

g. The letters "USA" mean the United States of America, its territories and possessions.

h. The words "budget line records" mean records for which the retail list price is regularly 2/3 or less of Capitol's usual price for purposes of computing distributor discounts for that category of record.

i. The words "club distribution plan" mean distribution by mail order direct to consumers.

23. NOTICES

All notices or payments which may be required to be made to Company may be made personally or by depositing same, postage prepaid, in any mail box, chute or other receptacle authorized by the United States Post Office Department for mail addressed to Company at the address below Company's signature or at such other single address as Company may designate by written notice mailed to Capitol at 1750 North Vine

FPI - RH

Street, Hollywood, California 90028, to the attention of
the Secretary. The date of service of any notice or payment
so deposited shall be the date of deposit.

24. ASSIGNMENT

Capitol may assign this Agreement or any of the
rights acquired under it to Capitol's parent or to any
subsidiary or affiliated corporation or to any entity ac-
quiring substantially all of Capitol's assets. Company
may assign this Agreement or any of the rights acquired
under it to Company's parent or to any subsidiary or affiliated
Corporation or to any entity acquiring substantially all
of Company's assets.

25. AGREEMENT FINAL

All prior negotiations and understandings be-
tween Capitol and Company in connection with the subject
matter hereof have been merged herein. Company represents
that no person acting or purporting to act on behalf of
Capitol has made any promises or representations upon which
Company has relied except those expressly found herein.
This Agreement may be altered only by an instrument executed
by Capitol and Company.

26. HEADINGS

The headings in this Agreement are for convenience
only and shall not operate to change the meaning of the
paragraphs involved.

27. EXECUTION

This Agreement shall become effective only when executed by an authorized signer on behalf of Capitol; it shall be deemed to have been made in the State of California and its validity, construction, performance, breach and operation shall be governed by the laws of the State of California applicable to contracts made and to be performed in California.

Very truly yours,

FAME PRODUCTIONS, INC.

By _____

Title _____
An Authorized Signer

603 East Avalon Avenue
P.O. Box 2527
Muscle Shoals, Alabama 35660

AGREED:

CAPITOL RECORDS, INC.

By _____

Title _____
    Elliot Chaum
    Secretary
An Authorized Officer

APPROVED BY
Legal

## ADDENDUM NO. 1

1.   Company represents and warrants that:

     a.   Company is the sole owner of the masters recorded hereunder (called the "masters") and of all the performances embodied therein; and that no other person, firm or corporation has any rights in or to the masters or any copy thereof;

     b.   There are no liens, encumbrances and/or obligations upon or in connection with the masters or in connection with the recording of the masters (i) all costs of recording, applicable union recording scale for all required Union fees and charges, and all government taxes have been paid in full, and (ii) all of the performers whose services were rendered in connection with the recording of the masters were contractually free to record phonograph records for Company of the selections embodied in the masters;

     c.   No records, mothers, stampers or other copies made and used in the manufacture of phonograph records have been produced from the masters and Company agrees that neither Company nor any person, firm or corporation acting for Company or with authorization from or acquiescence of Company (other than Capitol) will manufacture records from the masters so long as Capitol has the right to do so.

2.   Company further represents and warrants (i) that the masters were recorded under the current Phonograph Record Labor Contract with the American Federation of Musicians (called "AFM") and all the musicians who rendered services

in connection with the recording of the masters (includ-
ing instrumentalists, leaders, contractors, copyists, or-
chestrators and arrangers, if any) were paid the (scale
set forth in the said Labor Contract)(sums required to be
paid them under the said Labor Contract and the contribu-
tions to the Pension Welfare Fund required by Exhibit "B"
thereto were made); and (ii) that all American Federation
of Television & Radio Artists (called "AFTRA") members whose
performances are embodied in the masters were paid the rates
applicable under the current AFTRA Code of Fair Practices
for Phonograph Recordings. The foregoing representations
and warranties are respectively included for the benefit
of AFM, AFTRA, AFM and AFTRA members whose performances
are embodied in the masters and Capitol, and may be enforced
by AFM and/or AFTRA or their respective designees as the
case may be and by Capitol.

3. Company sells and transfers to Capitol all right,
title and interest of whatsoever kind or nature in and to
each of the masters for which payment is made by Capitol
under Section 2. of the Agreement to which this Addendum
is attached and all copies thereof, including but not lim-
ited to:

a. The exclusive ownership of the masters and
all duplicates thereof and records manufactured therefrom
and the right to use and control the same and the perform-
ances embodied therein;

b. Subject to the other provisions of this Agree-
ment the exclusive right throughout the world to manufac-
ture, advertise, sell, lease, license or otherwise use or
dispose of records manufactured from or embodying all or
any part of the contents of the masters or to refrain

-Page 2-

thereform in any and all fields of use throughout the world, upon such terms and conditions as Capitol may approve.

4. Capitol agrees (i) to make all required payments to the American Federation of Musicians Special Payments Fund and to the AFM Music Performance Trust Fund or successor Funds (or similar funds payment to which is required under any collective bargaining agreement to which Capitol is a party) for records manufactured from the masters and sold by Capitol; and (ii) to pay any mechanical license fees which may become properly due by reason of the sale by Capitol of such records.

5. Capitol agrees during the term of this Agreement:

a. Not to couple the performance of any Artist with the performance of any artist not recorded pursuant to this Agreement without Company's written consent, and

b. Not to release any record produced hereunder as a premium record or as a budget line record without Company's written consent.

ADDENDUM NO. 2

## PROVISIONS RELATING TO APPLICABLE CONTINGENT PAYMENTS

(A)  Contingent Payments will be computed and paid upon the aggregate number of records sold, in each applicable category after deducting either (a) returns, rebates and credits on records returned in each category or (b) 10% of the gross Contingent Payments (depending upon the basis upon which Capitol pays most of its other Artists) and Capitol shall in the event it proceeds under (a) above, be entitled to withhold from payments otherwise due from time to time reasonable reserves against anticipated returns, rebates and credits; (i) Contingent Payments applicable to budget line records shall be 50% of the otherwise applicable rate; (ii) Contingent Payments applicable to records sold through a club distribution plan shall be 50% of the otherwise applicable rate; no Contingent Payments will be payable with respect to records furnished as free or bonus to members or other participants in a club distribution plan, provided that if the number of such free or bonus records on a cumulative basis exceeds 50% of the total number of such records distributed as sold, free and/or bonus, Capitol will pay the applicable Contingent Payment on the number of such free and bonus records in excess of 50% of the total such records distributed, sold, free and/or bonus; (iii) No Contingent Payments will be payable on records given away or furnished on a "no-charge" or service charge basis for promotional purposes or furnished as a sales inducement or otherwise to

disk jockeys, radio and television stations and networks, distributors, subdistributors, dealers and others; provided that Capitol may not give away under this Item (iii) free of Contingent Payments more than 300 for each 1000 sold with respect to "single" records or more than one album for each 5 albums sold; further provided that no monies will be payable on any records given away pursuant to this Item (iii) regardless of the number thereof which are (a) given away at Company's direction or (b) are single records given away by Capitol to meet the competition from a single record embodying the same selection (or a very similar selection) recorded by another artist. (iv) No Contingent Payments will be payable on records sold as scrap; (v) No Contingent Payments will be payable in connection with records sold to any distributor designated by Company for which Capitol is not paid. (vi) Capitol will compute Contingent Payments within 60 days after the first day of March and September of each year (or such other semi-annual payment dates as Capitol may adopt) for the preceding 6 month period and will, within said 60 days, pay such Contingent Payments less any unrecouped advances/made prior to the first day of March or September whichever is relevant. *on an artist by artist basis*   _RH_   _FR-RH_

(B) As to records manufactured under this Agreement in the USA, Contingent Payments will be based upon the average applicable prices at which Capitol sells such records to Capitol's distribution subsidiaries in the USA except that in the case of records sold and/or distributed as premiums,   _may 1 — Nov. 1_   _FR-RH INITIALS_

Contingent Payments will be reduced by 75% and will be based upon the price to the advertiser or sponsor. In every case under this Paragraph (B) the price shall be less excise and other taxes directly applicable to the sale of the records.

(C) As to records manufactured under this Agreement outside the USA, (i) Contingent Payments will be based on the list price per record (less excise and other taxes directly applicable to the sale of the records) for retail sales in the country of manufacture or the country of sale (depending upon the basis upon which Capitol was paid), or upon the redemption price or the price to the advertiser or sponsor in the case of records sold and/or distributed as premiums; (ii) Only records for which payment is received by Capitol in the United States of America or by an affiliate of Capitol abroad shall be deemed sold; (iii) All Contingent Payments will be computed in the national currency of the country to which the list price so elected applies and will be paid at the same rate of exchange as Capitol is paid provided that if the currency is blocked in any country where Capitol has an affiliate or where the Contingent Payments are actually available to Capitol in the local currency, Capitol will, at Company's request deposit the amount of such Contingent Payments in such currency to Company's account and at Company's expense in a depository selected by Company and such deposit shall discharge Capitol's obligation to Company with respect to such Contingent Payments. All Contingent Payments applicable to this Agreement received from foreign sources shall be subject to any taxes directly applicable to the sale of the records; (iv) with respect only to records manufactured

by Capitol's licensees outside the United States of America, Contingent Payments on records packaged in albums, jackets, boxes, housed on reels or in cartridges or in other containers will be based upon the list price for replacement records, computed in accordance with the standard accounting practices of Capitol's licensees and computed in the same manner as that used by such licensees in paying Capitol. The list price of the albums, jackets, boxes, reels, cartridges or other containers used in computing Capitol's fees and any tax on the containers will be excluded in said determination; (v) Contingent Payments applicable to records sold under special merchandising plans or otherwise at less than the regular wholesale price applicable to the initial release of the records and/or applicable to records of that type in the record industry shall be reduced in the same proportion as the regular wholesale price was reduced on such sales.

(D) The specified percent of Contingent Payments shall be applied against that portion (to the nearest cent) of the computation price which the number of selections manufactured from masters recorded hereunder bears to the total number of selections on the said record.

(E) Company shall be deemed to have consented to all statements, and all other accounts rendered by Capitol to Company and the same shall be binding upon Company and not subject to any objection by Company for any reason whatsoever unless specific objection in writing stating the basis thereof is given to Capitol within 2 years from the date rendered, and if Capitol gives Company notice in writing that it denies the validity of the objection unless suit is instituted within 2 years of the date Capitol gave such notice.

FPI RH.

(F) Capitol has furnished Company with a schedule showing Capitol's prices to its distribution subsidiaries and its prices upon which it computes distributor discounts. If there is any change in said prices, Capitol will advise Company of such changes.

FPL-PH
INITIALS

EXHIBIT "A"

FPI · RH
INITIALS

## EXHIBIT "B"

1.   Artists' services are, during the term of the contract, exclusive to Company.

2.   Artist granted Company the right to use and publish and to permit others to use and publish his name and likeness and biographical material concerning Artist for advertising and trade purposes in connection with the sale and exploitation of records produced from the masters or to refrain therefrom.

3.   Artist agreed to look solely to Company for all compensation to him for his services and for any royalty which might be payable to him in connection with masters he records for Company.

4.   Artist agreed that Company might at any time assign Artist's contract or any rights thereunder to Capitol.

5.   Artist will not record for anyone other than Company's for the purpose of making records, any selection recorded for Company for 5 years after having recorded it for Company.

EXHIBIT "C"

1. Wilson Pickett
2. Etta James
3. Clarence Carter
4. Soul Survivors
5. Don Covay
6. Laura Lee
7. Otis Clay

# EXHIBIT "B"

Contract No. 5248

Los Angeles, California

Date: 8/26/1970

### A-G-R-E-E-M-E-N-T

Capitol Records, Inc.
1750 North Vine Street
Hollywood, California 90028

Gentlemen:

Capitol Records, Inc. (called "Capitol") and Fame Productions, Inc. (called "Company") are parties to an agreement dated May 6, 1969, being Capitol's Contract No. 4842, (called the "Capitol-Company Agreement-I"), in connection with the production of phonograph records.

Capitol and Company mutually agree to amend the Capitol-Company Agreement-I so that it shall terminate on April 30, 1970. The rights and obligations which by the provisions of said Capitol-Company Agreement-I survive the termination thereof shall remain in full force and effect and this document shall change said contract only so far as specified herein.

This will confirm the further agreement made as of May 1, 1970, by and between Capitol and Company (called the Capitol-Company Agreement-II). Company is in the business of producing master recordings (called "masters"). Company will continue to operate such business for the mutual benefit of Capitol and Company during the term hereof on the following terms:

1. TERM

The term of this agreement shall consist of (i) an initial period of one year commencing May 1, 1970; and (ii) four one year option periods. The option periods shall follow consecutively after the termination of the initial period. Each option may be exercised by Capitol's giving Company written notice thereof

INITIAL

at least 30 days prior to the expiration of the then current period. Each option shall be on all the same terms as apply to the initial period except as otherwise specified herein.

2. COMPANY'S ARTISTS

Company agrees to have contracts with at least 6 Artists each year of the term hereof for purposes of delivering masters to Capitol hereunder.

a. Notwithstanding the foregoing, so long as Company's services are exclusive to Capitol as provided in this Section 2., (i) all Artists hereafter coming under contract to Company shall be produced by Company subject to the terms of this agreement, and (ii) Company shall not produce any Artist nor authorize manufacture or distribution of records from any masters embodying performance of an Artist except pursuant to the terms of this agreement; provided, Company may produce five artists for any company other than Capitol; further provided, Company may from time to time during the term of this agreement substitute another artist for one of the five artists, provided that during the 12-month period following such substitution or the remainder of the term of this agreement Company shall not produce any artist for whom a substitution was made pursuant to this Paragraph 2.a.

b. If gross Contingent Payments which accrue to Company's account under this agreement do not, for actual sales in the period set forth in the Contingent Payments Table set forth below as of the end of such period, equal or exceed the amount set forth beside each such period in the Table, the restrictions on Company set forth in Paragraph 2.a., above will be

-2-



R.H.
INITIAL

inoperative except that Company shall continue under this agreement to produce those artists who have been produced pursuant to this agreement for the duration of their contracts at Capitol's option pursuant to the provisions of Section 17., below. Otherwise Company shall be free to produce artists not subject to this agreement for anyone it chooses.

CONTINGENT PAYMENTS TABLE

| | |
|---|---|
| Initial Period | $200,000.00 |
| 1st Option Period | $200,000.00 |
| 2nd Option Period | $300,000.00 |
| 3rd Option Period | $400,000.00 |

c.   Notwithstanding the foregoing, if the Contingent Payments which accrue in any period from actual sales shall be less than the amount shown in the Table above for such period, Capitol may pay Company the difference and thus prevent the obligations of Company under Paragraph 2.a. above from ending; provided, Capitol may not prevent such obligations from ending if the amount of the difference between Contingent Payments from actual sales and the amount set forth in the Table above is greater than 10% of the amount set forth in the Table above for that period.

3.   MASTER BUDGET OBLIGATION

Utilizing the services of at least 3 Artists, Company will produce at least 48 masters for Capitol during each period of the term hereof.

a.   Capitol will pay Company (upon submission of paid bills, AFM Form "B" contracts and other union contract forms required, all in Company's name) its actual costs incurred in producing each such master, but not, without Capitol's consent, more than $2,000.00 per master. Company may produce more than 48 masters per period for Capitol and Capitol will pay Company its actual cost of producing each such master

-3-

but, without Capitol's written consent, not more than $2,000.00 per master, provided that subject to Paragraphs 3.c. and 4.b., below, Capitol's total obligation (called "Budget Obligation") hereunder shall not exceed (i) the sum of $150,000.00 for the initial period and (ii) with respect to each option period hereof that becomes operative, the sum of $150,000.00 plus one-half of the Contingent Payments paid or accrued to Company for records manufactured and sold hereunder during the next pre-ceding period, but in no event shall the Budget Obligation for any option period exceed the sum of $265,000.00.

b.   The term "costs" as used in Paragraph 3.a., above, includes all costs of musicians; singers; arrangers; copyists; cartage and instrument rentals; studio, editing, mixing, and tape; transportation costs to the point of recording for artists, musicians, vocalists, and Company's producers; and living costs for artists, musicians, vocalists, and Company's producers, all when necessarily paid by Company.

c.   Company represents and warrants that it now employs five so-called "House Musicians". Capitol agrees that within 14 days after this agreement is executed and quarterly thereafter within 14 days after the first day of each August, November, February, and May during the term of this agreement, Capitol shall pay Company at the rate of $2,500.00 for each such House Musician that Company has given Capitol notice of and who will be employed during the then current quarter.

(1)   Capitol shall pay an additional $2,500.00 on the dates specified in this Paragraph 3.c. for each such House Musician in excess of five, but in no event shall Capitol be obligated to make payments in connection with more than a total of nine House Musicians. Capitol shall be obligated to make payment for only those House Musicians about whom Capitol has received notice, including the name of each.

-4-

R.H.
INITIAL

(2) All payments by Capitol pursuant to this Paragraph 3.c. shall be deemed advances against the costs of the services, transportation and living expenses as specified in Paragraph 3.b. above, for the House Musicians who perform in connection with masters recorded hereunder during the quarter subsequent to payment. To the extent such costs are actually incurred, they shall be called "Capitol Earnings" for purposes of this Paragraph 3.c.

(3) Within 14 days after the first day of (i) each August, November, February, and May during the term of this agreement, commencing with August 5, 1970, and (ii) the month next following the termination of this agreement, Company shall submit to Capitol copies of all paid bills, AFM Form "B" contracts and other required union contract forms indicating all payments made or accrued to the House Musicians during the next preceding quarter in connection with their services for other than the recording of masters hereunder (called the "Non-Capitol Earnings"). Concurrently therewith and only if Capitol's payment pursuant to this Paragraph 3.c. for such preceding quarter is greater than costs attributable to the House Musicians with respect to masters recorded hereunder for such quarter, Company shall pay Capitol the difference; provided, in no event shall Company be obligated to pay Capitol an amount greater than the Non-Capitol Earnings for such next preceding quarter.

(4) If for any quarter the total of (i) the Capitol Earnings plus (ii) the Non-Capitol Earnings is less than (iii) the payment made by Capitol pursuant to this Paragraph 3.c., the difference shall be called the "Excess Payment". Capitol shall not be able to apply the Excess Payment for any quarter against the costs of House Musicians who perform in connection

-5-

with masters recorded hereunder during any subsequent quarter; provided, if during any one year period of the term Capitol has made Excess Payments equal to $50,000.00, the guaranteed payments specified in this Paragraph 3.c. shall be terminated for the remainder of the then current period and Capitol shall not be obligated therefor.

(5) During each period of this agreement the Budget Obligation specified in Paragraph 3.a., above, shall be reduced to the extent payments are made pursuant to this Paragraph 3.c. and Capitol is not reimbursed therefor by Company.

d. The minimum 48 masters to be delivered to Capitol hereunder in each period of the term shall be delivered to Capitol as follows, not less than 36 of which shall be delivered for release as 18 single records: (i) 16 masters not later than the end of the 6th month of the relevant period; (ii) 20 additional masters not later than the end of the 9th month of the relevant period and (iii) the balance not later than the end of the 11th month of the relevant period.

4. ALBUMS

If a single record of any Artist reaches the top 40 of the "Hot 100" chart in "Billboard" Magazine or the "Top 100" chart in "Cash Box" Magazine, Company shall have the right to produce sufficient additional masters, in Company's judgment, to constitute an album and deliver such masters to Capitol for release as an album. Capitol will use its best efforts to release such album within 60 days after Company delivers the masters to Capitol, but in no event later than 90 days after such delivery.

a. If a single record of any Artist reaches the top 20 of either one of the aforesaid charts, Capitol may ask



-6-

Company to produce sufficient additional masters, in Capitol's judgment, to constitute an album and Company will promptly produce such masters and deliver them to Capitol.

b. The limits on Capitol's Budget Obligation for masters produced in any period shall apply to masters produced for albums pursuant to this Section 4.; provided the amount paid by Capitol for masters in such an album or produced because of a written request from Capitol for production of such masters shall not be counted as part of the Budget Obligation to the extent that to count the amount paid for album masters would make the total amount expended by Capitol (for albums and single records) equal or exceed the Budget Obligation for the relevant year.

5. <u>MASTER TAPES</u>

Company will send Capitol final stereo and monaural tape masters of each recording and Capitol will send Company 3 proof reference discs of each single record made hereunder for approval or disapproval. If Company fails to approve or disapprove such proof reference discs within 10 days after Capitol sends them to Company by air mail, Capitol may deem all of such discs approved and select any one Capitol wishes. Company may designate the time of release of single records and albums; provided, Capitol must have at least 21 days notice for release of a single record and 60 days notice (after Company has approved the cover and liner) for release of an album.

6. <u>MANUFACTURING REQUIREMENTS</u>

a. During the term of this agreement with respect to records manufactured from masters delivered hereunder and

-7-


INITIAL

released, Capitol shall manufacture and have available for distribution not less than the following quantities:

(1) With respect to each single record, a quantity equal to one-half of the net USA sales (as of the last day of the month next preceding the month during which the then current single is released) for the immediately prior single embodying performances of the same Artist, but in no event less than 25,000 units or more than 100,000 units.

(2) With respect to each album, a quantity equal to one-half of the net USA sales (as of the last day of the month next preceding the month during which the then current album is released) for the immediately prior album embodying performances of the same Artist, but in no event less than 25,000 units or more than 100,000 units.

b. Notwithstanding anything to the contrary contained herein, Capitol shall not be obligated to manufacture the minimum quantities specified in Subparagraph 6.a.(1), above, with respect to more than 24 single records during any period of the term.

7. COVERS AND LINERS

Company shall have the right to approve or disapprove covers and liners of each 33-1/3 rpm disc type album to be released on Company's label. For this purpose and no later than 30 days after Company delivers to Capitol the masters for such album Capitol will send camera ready finished art for the cover and a velox copy of the liner to Company. If Company has not disapproved a cover or liner within 10 days after Capitol sends such material to Company by air mail, such cover or liner shall be deemed approved.

-8-

INITIAL

## 8. PAYMENTS

a. Conditioned upon the full and faithful performance of each and all of the provisions of this agreement by Company which are to be performed by Company, Capitol agrees to pay Company in connection with records manufactured from masters purchased hereunder a Contingent Payment, subject to the provisions below, of 24% in connection with records manufactured in the USA and 6% with respect to records manufactured outside the USA.

b. Contingent Payments hereunder shall be computed and paid in the manner prescribed in Addendum No. 2 annexed hereto, which Addendum constitutes an integral part hereof.

c. If the price upon which Capitol computes distributor discounts for the Capitol label (which price is also sometimes referred to as the suggested retail price) increases or decreases, then the prices upon which Contingent Payments are to be computed hereunder shall, for purposes of computing Contingent Payments, increase or decrease proportionately.

d. If Capitol is required to pay any sales or use tax in connection with any of the masters recorded hereunder, the Contingent Payment rate of 24% referred to in Paragraph 8.a., above, shall be increased to 25% and if Capitol pays such tax, Capitol shall be entitled to recover such sales or use tax (up to a total sales or use tax of 5%) from the Contingent Payments payable to Company in connection with any masters embodying the performance of the Artist whose performance is embodied in the master in connection with which Capitol paid or must pay such sales or use tax.

9. ADVANCES RECOVERABLE

a. All payments by Capitol to Company under Paragraphs 3.a. and 3.b., above, shall be deemed advances recoverable by Capitol from Contingent Payments payable to Company in connection with any masters embodying the performances of the Artist whose performance is embodied in the master in connection with which Capitol made such payment.

b. Company acknowledges receipt of the sum of $25,000.00, which amount shall be deemed an advance against amounts otherwise payable to Company pursuant to Paragraphs 3.a. and 3.b., above.

10. ARTIST ROYALTIES - PRODUCER PAYMENTS

a. Company agrees to inform Capitol of the royalty payable by Company to the Artist whose performance is embodied on each master Company delivers to Capitol hereunder. The difference between such Artist royalty and the total Contingent Payment payable to Company for such master is the "Company Share."

b. For the purpose of enabling Company to pay for the services of a producer in connection with masters recorded hereunder, Capitol agrees to pay Company the sum of $12,500.00 within 14 days after this agreement is executed and thereafter the sum of $12,500.00 within 14 days after the first day of each August, November, February, and May during the term.

c. All payments to Company pursuant to Paragraph 10.b., above, shall be deemed advances recoverable from the Company Share of the Contingent Payments in connection with

-10-


INITIAL

records manufactured from all masters recorded hereunder, regardless of the Artist whose performance is embodied in any such master.

d. Notwithstanding anything to the contrary contained herein, Company agrees that if the compensation of any person in connection with the recording of the masters is based on a royalty, the obligation to pay such royalty is and shall remain Company's sole obligation and Company will hold Capitol harmless from any claim by the producer and/or performer in that connection.

11. PROMOTION PAYMENT

In addition to advances and Contingent Payments hereunder, and without any recovery from payments otherwise due Company hereunder:

a. Capitol will pay Company $115,000.00 during each period of the term. The first payment of $115,000.00 shall be made within 14 days after the execution of this agreement. A like sum shall be paid for each option period which becomes operative within 14 days after the commencement date of such option period. Payments pursuant to this Paragraph 11.a. are for the purpose of enabling Company to hire promotion men to promote records produced and released pursuant to this agreement; to cover such promotion men's salary and expenses; and to enable Company to lease an automobile and pay other expenses Company may wish to incur solely for promotion of records released pursuant thereto.

b. During the term of this agreement Capitol will furnish without cost to Company at Capitol's offices in Hollywood, California: (i) an office and secretary for a Company promotion man; (ii) office equipment and supplies; (iii) recording playback

-11-



INITIAL

equipment; and (iv) three telephones, including use of Capitol's WATS line and regular telephone service; provided, in no event shall the telephone service furnished commencing August 1, 1970, exceed a total cost of $750.00 during any one month using Capitol's usual manner of allocating such costs; and further provided, Capitol shall not be obligated to furnish space, equipment, services, or supplies in excess of that reasonably required or furnished to Capitol personnel.

c.    Within 14 days after this agreement is executed and within 14 days after the commencement of each option period during the term of this agreement, Capitol shall pay Company the sum of $10,000.00 to be used for expenses incurred in traveling to Los Angeles, California, for purposes of consulation between Company and Capitol.

12.    SHIPMENTS TO COMPANY

a.    Upon Company's written request by its designated agent in each case and provided the single record has not been deleted from Capitol's catalog, Capitol shall deliver to Company single records manufactured from masters delivered hereunder on the following terms and conditions:

(1)    Capitol shall deliver without cost to Company that number of units ordered by Company, but not more than a total of 4,000 "commercial" units of each single record.

(2)    With respect to any single record that has net USA sales in excess of 100,000 units, Capitol shall deliver additional units to Company, but not more than that quantity equal to 3% of such excess. Notwithstanding anything to the contrary contained herein, within 14 days after Capitol's billing, Capitol shall deduct from any monies otherwise payable to Company the sum of $0.14, without any cash or other discount, for each single record shipped pursuant to this Sub-paragraph 12.b.(2).



-12-

b.    All records shipped pursuant to this Section 12.
shall be shipped f.o.b. (surface freight only) the address
below Company's signature or to the Capitol Records Distribution
Corp. distribution center designated by Company.  If Company
requests any shipment to be made by other than surface freight
or to other than an address specified in this Paragraph 12.b.,
Company shall pay all shipping costs in connection therewith
and, with respect to records shipped pursuant to Sub-paragraph
12.a.(2), without any reduction in the price specified therein.

c.    Company agrees that with respect to all
musical compositions owned or controlled by Company or any
entity in which Company has an interest, no mechanical
license fees shall be payable in connection with records
delivered pursuant to this Section 12.  Company further agrees
that within 14 days after Capitol's billing, Company shall pay
Capitol all mechanical license fees with respect to all other
musical compositions embodied in records delivered pursuant to
this Section 12. to the extent Capitol is obligated to pay such
fees.

13.  LABELS

The initial release of all records produced here-
under and released by Capitol during the term of this agreement
will, in the United States of America and Canada, be on Company's
label in the form of Exhibit "A" hereto.  Capitol's rights
and obligations with respect to said label shall terminate
upon the termination of this agreement and all records thereafter
manufactured from masters subject to the terms of this agreement
shall be released on the Capitol label or such other label
as Capitol uses for comparable product unless Company elects

-13-

to require Capitol to continue to release records of masters subject hereto on Company's label. If Company does so elect, so long as Capitol is so obligated to use Company's label Company shall not itself issue any records on said label or authorize anyone else to issue records on such label.

a.    Company will notify Capitol in writing after the termination of this agreement whether or not Company elects to have Capitol continue to use Company's label, and any such election shall be final. If after the term of this agreement Capitol requests in writing that Company make such election and Company fails to make such election with 30 days after such request, Company shall be deemed to have elected not to require or allow Capitol to continue using Company's label.

b.    Company represents and warrants that it is the sole owner of the label identified in Exhibit "A" and any trademark thereon and agrees to hold Capitol harmless and to indemnify Capitol against any damages or costs (including reasonable attorney's fees) arising from any claim that said label or trademark infringes the rights of others. Capitol's obligation to use said label and/or trademark shall continue only so long as Capitol's use thereof is without costs to Capitol. Records may be released outside the United States of America and Canada on such label as Capitol's foreign licensees customarily use for like product.

14.    RIGHT TO USE NAME

Company grants to Capitol the right, so long as Capitol has the right to release records of masters produced hereunder, to use and publish and to permit others to use and publish Company's name for advertising and trade purposes in connection with records manufactured from masters which Company produces hereunder.



-14-

15. CAPITOL PROMOTION

a.  During each one year period of the term Company
shall have the right to designate and upon Company's written
request Capitol shall place up to a total of 95 Units (computed
pursuant to the Schedule immediately below) of advertising in
one or more so-called "trade" magazines for the purpose of promoting
records manufactured from masters delivered hereunder.  For purposes
of this Paragraph 15.a. the following Unit values shall apply:

SCHEDULE

| TYPE OF ADVERTISING | UNIT VALUE |
|---|---|
| 4-color full-page | 5 |
| 4-color half-page | 3 |
| Black & White full-page | 3 |
| Black & White half-page | 2 |

b.  During each one year period of this agreement
Company may designate not more than six records with net USA
sales greater than 100,000 units to be the subject of a concentrated
promotion effort.  With respect to each record so designated
Capitol shall conduct the following campaign commencing when
Capitol's schedule reasonably permits:  within a ten-day period
not less than one-half of the promotion men employed by Capitol
or Capitol's distribution subsidiary shall personally deliver a
copy of such record to radio stations normally serviced by Capitol.

c.  Records manufactured from masters delivered
hereunder shall not, for purposes of promotion, be designated
as so-called "Pop" records or "R & B" records; provided, (i) such
records shall be distributed and promoted by Capitol's distribution
subsidiary and by Capitol's promotion men along with "Pop" and
"R & B" records; and (ii) any promotion bonus customarily payable to

-15-



INITIAL

Capitol's promotion men by Capitol and Capitol's distribution subsidiary in connection with radio airplay with respect to "Pop" and "R & B" records shall be applicable to such records.

d. Each single record manufactured from masters delivered hereunder shall remain on Capitol's so-called "Pop" and "R & B" record worklists not less than four weeks, after which period Capitol may remove it provided Capitol first consults with Company.

e. Promotional copies of all records manufactured from masters delivered hereunder shall be delivered to all radio stations normally serviced by Capitol except those stations that play predominently "Country & Western" music.

16. SALES REPORTS

With respect to only those records manufactured from masters delivered hereunder Capitol shall furnish to Company's designee and without charge to Company daily sales reports from both wire and computer services for each distribution area in the USA; provided, Capitol shall be so obligated only to the extent that such reports and information are regularly available to Capitol.

17. ARTIST CONTRACTS

Company agrees that:

a. Each Artist's contract with Company shall provide for a total duration of not less than 3 years. Company will use its best efforts to obtain a total term of not less than 5 years.

b. Each Artist's contract will contain terms substantially covering the points enumerated in Exhibit "B" hereto. Company agrees to enforce such terms for Capitol's benefit. Company agrees not to have any artist who has recorded

-16-

any selection for masters hereunder, record the same selection
for any other record company for at least 5 years after such
artist records such selection for Company pursuant to this agreement.

    c.   The services of each Artist produced by Company
pursuant to this agreement and/or Capitol-Company Agreement-I
will be made available to Capitol, notwithstanding the termination
of this agreement, from year to year, at Capitol's election and
upon written notice and payments to Company as provided herein
within 14 days after termination hereof, for the duration of such
Artist's contract but not more than a total of 5 years including
the period such Artist's services are provided during the term
of this agreement. Capitol must give Company at least 30
days notice to exercise each Artist's option prior to the
expiration date of the current period of such Artist's con-
tract. Company will provide Capitol with a schedule of such
expiration dates not later than the termination of the term
of this Agreement. With respect to each Artist whose services
are made available to Capitol pursuant to this Paragraph 17.c.,
during each year of such availibility: (i) Company shall deliver
and Capitol shall purchase not less than six masters for release
as single records and sufficient masters to constitute an album
and (ii) at Capitol's request Company shall deliver and Capitol
shall purchase sufficient additional masters to constitute an album.

    d.   With respect to each Artist whose services
are made available to Capitol at its election after the termination
of this agreement pursuant to Paragraph 17.c. above, there shall
be computed at the beginning of each year after such termination
an amount equal to one-half the Contingent Payments with respect
to such Artist during the preceding year (called the "Artist
Guarantee"). The Artist Guarantee shall be paid to Company in

-17-

quarterly installments commencing upon the termination of this agreement for the first year of availability after such termination, and so forth for each year thereafter that Capitol elects the availability of such Artist's services. Provided:

(1) If during any year after termination of this agreement Company's Contract with any such Artist terminates, Capitol shall not be obligated to make any quarterly Artist Guarantee payments on those quarterly payment dates subsequent to the termination of the Artist Contract.

(2) Notwithstanding the termination of this agreement, if the second record embodying any such Artist's performances has not been released at least four months prior to the termination of this agreement, Capitol shall not notify Company of its election to retain the availability of such Artist or make any Artist Guarantee payments until 14 days after the end of the fourth full month following the release of such second single record. The Artist Guarantee applicable for that Artist during the first year after such termination (i) shall be equal to one-half of the Contingent Payments made with respect to such Artist during the 12 months prior to the end of the fourth full month following the release of such second single record; and (ii) shall be paid to Company in equal installments on each of the quarterly payment dates remaining in the first year after the termination of this agreement.

(3) In no event shall the Artist Guarantee for any Artist be less than $10,000.00 or more than $50,000.00.

(4) All Artist Guarantee payments made hereunder shall be deemed advances recoverable from Contingent Payments otherwise payable in connection with the relevant Artist.

-18-

INITIAL

e.    At the time of delivery of a master to Capitol hereunder, each of the representations, warranties and covenants set forth in Addendum No. 1 hereto will be true with respect to such master.

## 18.    ASSIGNMENT OF ARTIST CONTRACTS

If at any time during the term of this agreement, Company decides that it no longer wishes to produce a particular Artist, Company shall give Capitol written notice to that effect. Within 10 days after receipt of such notice, Capitol may give Company written notice that Capitol elects to have Company assign its contract with such Artist to Capitol in which event Company shall so assign such contract and Company shall not be entitled to royalties with respect to any master thereafter produced. If Capitol does not so elect, Company's obligation to continue producing such Artist for Capitol shall terminate. Nothing herein shall relieve Company of its obligation to provide Capitol with the services of and to produce at least 3 Artists each year during the term of this agreement. Any assignment of a contract hereunder by Company shall be subject to Capitol's agreeing to assume all of Company's obligations in connection with such contract.

## 19.    BREACH BY ARTIST

Notwithstanding any other provision of this agreement Company shall not be responsible for any breach by an Artist of his contract with Company or the consequences of such breach, provided that such breach could not have been prevented by Company.

## 20.    BUY-BACK

Five years after the initial release by Capitol of a record manufactured from a master produced hereunder,

-19-

INITIAL

Company shall have the right to repurchase such master from Capitol for the sum of $1.00. If Company desires to repurchase any such master, Company shall so inform Capitol in writing identifying the master Company wishes to buy. Capitol shall promptly deliver to Company the original tape copies of such master and all of Capitol's rights with respect to such master shall thereupon terminate except that Capitol may continue, on all the terms stated herein, to distribute existing inventory of records of such master for 6 months after such repurchase by Company. Company's right to repurchase any master produced hereunder and released by Capitol shall end 7 years after the last master produced pursuant to Paragraph 17.c. above is first released by Capitol and Capitol shall thereafter have complete ownership in perpetuity of any masters not so repurchased. Capitol may thereafter release records of such masters on any label owned or controlled by Capitol or a licensee of Capitol. Company shall have the right at any time during the two year period after the termination of each Artist's Contract as the same may continue after the term hereof to buy back for a purchase price of $1.00 per master any master which has not been released by Capitol.

21. PARTY SIGNATORY

Company represents and warrants that it is a Company signatory to the American Federation of Musicians Phonograph Record Labor Agreement, the Special Payments Fund Agreement and the Phonograph Record Trust Agreement, all of April, 1969 and that Company is a party signatory to the American Federation of Television and Radio Artists National Code of Fair Practice for Phonograph Recordings. Further, if during the term hereof, Capitol signs any successor agreement to the aforesaid agreements with the AFM and/or AFTRA, Company will likewise sign such successor

INITIAL

-20-

agreements. Capitol will reimburse Company for verified payments made by Company to the AFTRA Pension and Welfare Fund in connection with payments made to Artists for services rendered pursuant to this agreement.

22. NON-DELIVERY BY COMPANY

If Company fails to provide Capitol with tape masters as required in this agreement, Capitol may either (i) terminate this agreement as of the date Capitol sends Company written notice to that effect and Capitol's only obligation to Company thereafter shall be with respect to masters theretofore purchased by Capitol hereunder, or (ii) suspend the term of this agreement until Company has cured its default under this agreement in which event an amount of time equal to the period of such suspension shall be added to the then current period. Written notice of any such election by Capitol must be given to Company within the then current period. No termination hereunder will affect Capitol's obligation to account and pay Contingent Payments as they accrue hereunder.

23. FORCE MAJEURE

If at any time during the term hereof by reason of any act of God, fire, earthquake, flood, explosion, strike, labor disturbance, civil commotion, act of Government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting Capitol or Company or any subsidiary or affiliate of Capitol or Company, or the industry in which it is or they are engaged, or any shortage of, or failure or delays in the delivery of materials, supplies, labor or equipment, or any other cause or causes beyond the control of Capitol and/or Company, any affiliate or subsidiary, whether of the same or any other nature, Capitol is unable to press

-21-

K.H.
INITIAL

and/or distribute records manufactured from masters produced hereunder or Company is unable to produce masters hereunder, either party may, upon notice to the other, suspend the term of this agreement for the duration of any such contingency.. A number of days equal to the total of all such days of suspension shall be added to the then current period and the commencement of the succeeding periods shall be postponed accordingly.

24. DEFINITIONS

a. The word "person" means a person, firm or corporation.

b. The word "selection" means a single musical composition (including a medley), story, poem or similar work, irrespective of length.

c. The word "master" means any original recording which embodies a performance by Artist.

d. The noun "record" means any device by which sound may be recorded for later transmission to listeners, whether now known or unknown and howsoever used. The noun "record" does not include a "master" as defined above.

e. The words "single record" mean a disc type record with one selection on each side, each selection being usually of a playing time not exceeding three minutes and thirty seconds.

f. The word "album" means a record other than a single record.

g. The letters "USA" mean the United States of America, its territories and possessions.

h. The words "budget line records" mean records for which the retail list price is regularly 2/3 or less of

-22-


INITIAL

Capitol's usual price for purposes of computing distributor discounts for that category of record.

    i.  The words "club distribution plan" mean distribution by mail order direct to consumers.

### 25. NOTICES

All notices or payments which may be required to be made to Company may be made personally or by depositing same, postage prepaid, in any mail box, chute or other receptacle authorized by the United States Post Office Department for mail addressed to Company at the address below Company's signature or at such other single address as Company may designate by written notice mailed to Capitol at 1750 North Vine Street, Hollywood, California 90028, to the attention of the Secretary. The date of service of any notice or payment so deposited shall be the date of deposit.

### 26. ASSIGNMENT

Capitol may assign this agreement or any of the rights acquired under it to Capitol's parent or to any subsidiary or affiliated corporation or to any entity acquiring substantially all of Capitol's assets. Company may assign this agreement or any of the rights acquired under it to Company's parent or to any subsidiary or affiliated Corporation or to any entity acquiring substantially all of Company's assets.

### 27. AGREEMENT FINAL

All prior negotiations and understandings between Capitol and Company in connection with the subject matter hereof have been merged herein. Company represents that no person acting or purporting to act on behalf of Capitol has made any promises or representations upon which Company has relied except those expressly found herein. This agreement may be altered only by an instrument executed by Capitol and Company.

-23-

28. HEADINGS

The headings in this agreement are for convenience only and shall not operate to change the meaning of the paragraphs involved.

29. EXECUTION

This agreement shall become effective only when executed by an authorized signer on behalf of Capitol; it shall be deemed to have been made in the State of California and its validity, construction, performance, breach and operation shall be governed by the laws of the State of California applicable to contracts made and to be performed in California.

30. NOTICE OF LATE PAYMENTS

Notwithstanding anything to the contrary contained herein, if any payment Capitol is obligated to make to Company pursuant to this agreement is not paid within 20 days after the date when it is otherwise due, Company may give Capitol notice of its default in payment. Capitol shall have 20 days from the date of such notice to cure such default. If payment is not received during such 20-day period, Capitol's obligation shall be increased to 110% of the amount otherwise due and thereafter Company may again give Capitol notice of its default in payment. If payment is not received within 15 days from the date of Company's second notice, Capitol's shall then be 120% of the original amount otherwise due. All amounts paid pursuant to this Section 30. in excess of the original amount otherwise due shall not be recoverable by Capitol from any other amounts otherwise payable to Company.

AGREED:

CAPITOL RECORDS, INC.

By: _____

Title: _____
        An Authorized Officer

Very truly yours,

FAME PRODUCTIONS, INC.

By: _____

Title: _____
        An Authorized Signer

603 East Avalon Avenue
P. O. Box 2527
Muscle Shoals, Alabama 35660

ADDENDUM NO. 1

1. Company represents and warrants that:

a. Company is the sole owner of the masters recorded hereunder (called the "masters") and of all the performances embodied therein; and that no other person, firm or corporation has any rights in or to the masters or any copy thereof;

b. There are no liens, encumbrances and/or obligations upon or in connection with the masters or in connection with the recording of the masters (i) all costs of recording, applicable union recording scale for all required Union fees and charges, and all government taxes have been paid in full, and (ii) all of the performers whose services were rendered in connection with the recording of the masters were contractually free to record phonograph records for Company of the selections embodied in the masters;

c. No records, mothers, stampers or other copies made and used in the manufacture of phonograph records have been produced from the masters and Company agrees that neither Company nor any person, firm or corporation acting for Company or with authorization from or acquiescence of Company (other than Capitol) will manufacture records from the masters so long as Capitol has the right to do so.

2. Company further represents and warrants (i) that the masters were recorded under the current Phonograph Record Labor Contract with the American Federation of Musicians (called "AFM") and all the musicians who rendered services

INITIAL

in connection with the recording of the masters (including
instrumentalists, leaders, contractors, copyists, orchestrators
and arrangers, if any) were paid the (scale set forth in said
Labor Contract)(sums required to be paid them under the said
Labor Contract and the contributions to the Pension Welfare Fund
required by Exhibit "B" thereto were made); and (ii) that all
American Federation of Television & Radio Artists (called
"AFTRA") members whose performances are embodied in the masters
were paid the rates applicable under the current AFTRA Code of
Fair Practices for Phonograph Recordings. The foregoing
representations and warranties are respectively included for
the benefit of AFM, AFTRA, AFM and AFTRA members whose performances
are embodied in the masters and Capitol, and may be enforced
by AFM and/or AFTRA or their respective designees as the case
may be and by Capitol.

3. Company sells and transfers to Capitol all right,
title and interest of whatsoever kind or nature in and to
each of the masters for which payment is made by Capitol
under Section 3. of the Agreement to which this Addendum
is attached and all copies thereof, including but not
limited to:

a. The exclusive ownership of the masters and
all duplicates thereof and records manufactured therefrom
and the right to use and control the same and the performances
embodied therein;

b. Subject to the other provisions of this
Agreement the exclusive right throughout the world to manufacture,
advertise, sell, lease, license or otherwise use or dispose of
records manufactured from or embodying all or any part of the

-26-

contents of the masters or to refrain therefrom in any and all fields of use throughout the world, upon such terms and conditions as Capitol may approve.

4.  Capitol agrees (i) to make all required payments to the American Federation of Musicians Special Payments Fund and to the AFM Music Performance Trust Fund or successor Funds (or similar funds payment to which is required under any collective bargaining agreement to which Capitol is a party) for records manufactured from the masters and sold by Capitol; and (ii) to pay any mechanical license fees which may become properly due by reason of the sale by Capitol of such records.

5.  Capitol agrees during the term of this Agreement:

a.  Not to couple the performance of any Artist with the performance of any artist not recorded pursuant to this Agreement without Company's written consent, and

b.  Not to release any record produced hereunder as a premium record or as a budget line record without Company's written consent.



## ADDENDUM NO. 2
PROVISIONS RELATING TO APPLICABLE CONTINGENT PAYMENTS

1. Contingent Payments will be computed and paid upon the aggregate number of records sold, in each applicable category after deducting either (a) returns, rebates and credits on records returned in each category or (b) 10% of the gross Contingent Payments (depending upon the basis upon which Capitol pays most of its other Artists). In the event it proceeds under 1.(a) above, Capitol shall be entitled to withhold from payments otherwise due from time to time reasonable reserves against anticipated returns, rebates and credits; provided, with respect to all records other than so-called "Christmas product" reasonable reserves shall not exceed 25% of the payments otherwise due for any quarterly accounting period and which reserves shall be paid to Company no later than 60 days after the end of the fifth quarterly accounting period following that period for which they were withheld. (i) Contingent Payments applicable to budget line records shall be 50% of the otherwise applicable rate. (ii) Con- Payments applicable to records sold through a club distribution plan shall be 50% of the otherwise applicable rate; no Contingent Payments will be payable with respect to records furnished as free or bonus to members or other participants in a club distribution plan, (provided that if the number of such free or bonus records on a cumulative basis exceeds 50% of the total number of such records distributed as sold, free and/or bonus, Capitol will pay the applicable Contingent Payment on the number of such free and bonus records in excess of 50% of the total such records distributed, sold free and/or bonus. (iii) No Contingent Payments will be payable on records given away or furnished on a "no charge" or service charge basis for promotional

-28-



purposes or furnished as a sales inducement or otherwise to disk jockeys, radio and television stations and networks, distributors, subdistributors, dealers and others; provided that Capitol may not give away under this Item (iii) free of Contingent Payments more than 300 for each 1000 sold with respect to "single" records or more than one album for each 5 albums sold; further provided that no monies will be payable on any records given away pursuant to this Item (iii) regardless of the number thereof which are (a) given away at Company's direction or (b) are single records given away by Capitol to meet the competition from a single record embodying the same selection (or a very similar selection) recorded by another artist. (iv) No Contingent Payments will be payable on records sold as scrap. (v) Capitol will compute Contingent Payments within 60 days after the first day of March, June, September and December of each year (or such other quarterly payment dates as Capitol may adopt) for the preceding 3 month period and will, within said 60 days, pay such Contingent Payments less any unrecouped advances on an artist by artist basis made prior to the first day of March, June, September or December, whichever is relevant. Within 15 days of Company's written request Capitol shall furnish to Company an explanation of any royalty statement sent to Company. (vi) Within 15 days of Company's request Capitol shall furnish Company with copies of computer tab runs showing the units sold and returned during the preceding quarter of records manufactured from masters delivered hereunder. Company shall not request such information more frequently than quarterly.

2. As to records manufactured under this Agreement in the USA, Contingent Payments will be based upon the average applicable prices at which Capitol sells such records to Capitol's distribution subsidiaries in the USA except that in the case of records sold and/or distributed as premiums, Contingent Payments will be reduced by 75% and will be based upon the price to the advertiser or sponsor. In every case under this Paragraph 2, the

-29-

price shall be less excise and other taxes directly applicable to the sale of the records.

3. As to records manufactured under this Agreement outside the USA, (i) Contingent Payments will be based on the list price per record (less excise and other taxes directly applicable to the sale of the records) for retail sales in the country of manufacture or the country of sale (depending upon the basis upon which Capitol was paid), or upon the redemption price or the price to the advertiser or sponsor in the case of records sold and/or distributed as premiums; (ii) Only records for which payment is received by Capitol in the United States of America or by an affiliate of Capitol abroad shall be deemed sold; (iii) All Contingent Payments will be computed in the national currency of the country to which the list price so elected applies and will be paid at the same rate of exchange as Capitol is paid provided that if the currency is blocked in any country where Capitol has an affiliate or where the Contingent Payments are actually available to Capitol in the local currency, Capitol will, at Company's request deposit the amount of such Contingent Payments in such currency to Company's account and at Company's expense in a depository selected by Company. Any such deposit shall discharge Capitol's obligation to Company with respect to such Contingent Payments. All Contingent Payments applicable to this Agreement received from foreign sources shall be subject to any taxes directly applicable to the sale of the records; (iv) with respect only to records manufactured by Capitol's licensees outside the United States of America, Contingent Payments on records packaged in albums, jackets, boxes, housed on reels or in cartridges or in other containers

-30-



will be based upon the list price for replacement records, computed in accordance with the standard accounting practices of Capitol's licensees and computed in the same manner as that used by such licensees in paying Capitol. The list price of the albums, jackets, boxes, reels, cartridges or other containers used in computing Capitol's fees and any tax on the containers will be excluded in said determination; (v) Contingent Payments applicable to records sold under special merchandising plans or otherwise at less than the regular wholesale price applicable to the initial release of the records and/or applicable to records of that type in the record industry shall be reduced in the same proportion as the regular wholesale price was reduced on such sales.

4. The specified percent of Contingent Payments shall be applied against that portion (to the nearest cent) of the computation price which the number of selections manufactured from masters recorded hereunder bears to the total number of selections on the said record.

5. Company shall be deemed to have consented to all statements, and all other accounts rendered by Capitol to Company and the same shall be binding upon Company and not subject to any objection by Company for any reason whatsoever unless specific objection in writing stating the basis thereof is given to Capitol within 2 years from the date rendered, and if Capitol gives Company notice in writing that it denies the validity of the objection unless suit is instituted within 2 years of the date Capitol gave such notice.

6. Capitol has furnished Company with a schedule showing Capitol's prices to its distribution subsidiaries and its prices upon which it computes distributor discounts. If there is any change in said prices, Capitol will advise Company of such changes

EXHIBIT "A"

-32-

# EXHIBIT "B"

1. Artists' services are, during the term of the contract, exclusive to Company.

2. Artist granted Company the right to use and publish and to permit others to use and publish his name and likeness and biographical material concerning Artist for advertising and trade purposes in connection with the sale and exploitation of records produced from the masters or to refrain therefrom.

3. Artist agreed to look solely to Company for all compensation to him for his services and for any royalty which might be payable to him in connection with masters he records for Company.

4. Artist agreed that Company might at any time assign Artist's contract or any rights thereunder to Capitol.

5. Artist will not record for anyone other than Company for the purpose of making records any selection recorded for Company for 5 years after having recorded it for Company.

INITIAL

# EXHIBIT "C"

HENRY CRAFT
NICK PESCE
ALEX J. MIGLIARA
LOUIS CHIOZZA, JR.

CABLE ADDRESS:
"PAMRAFT"

CRAFT, PESCE, MIGLIARA & CHIOZZA
ATTORNEYS AT LAW
202 ADAMS AVENUE
MEMPHIS, TENN. 38103

526-6476
526-6477
526-6478
526-6479

June 17, 1971

Mr. Charles Tillinghast
Secretary - Capitol Records, Inc.
The Capitol Tower
Hollywood, California  90028

REGISTERED - RETURN RECEIPT REQUESTED

Re:  Fame Productions, Inc., -
Capitol Records, Inc.
Contract #4842
Date:  May 6, 1969
Contract #5247
Date:  August 26, 1970

Dear Mr. Tillinghast:

This is to advise that Fame Productions, Inc.,
exercises its right to repurchase all master re-
cordings heretofore delivered to Capitol under the
referred to contracts and all rights pertinent to
said masters, as same is provided under paragraphs
18 and 20 respectively of the referenced contracts.

Yours very truly,

ALEX J. MIGLIARA

AJM/pc

cc:  Mr. B. Menon,
President Capitol Records, Inc.

Mr. Elliot Chaum, Vice President
Business Affairs, Capitol Records, Inc.

Mr. Rick Hall, President
Fame Productions, Inc.

# EXHIBIT "D"

# FAX ♪ FAX ♪ FAX ♪ FAX ♪ FAX ♪ FAX

*Cema*
*Special Markets*
**Dawn Van Patten**
**213-960-4658** Phone
**213-960-4666** Fax

**DATE:**  May 16, 1994

**TO:**  Rick Hall
  Fame Records
**FAX:**  (205) 381-6337

**SUBJECT:**  "Soul Patrol"/Ripete Records

Rick:

I am in receipt of your fax to Frank Lopez regarding publisher info for Clarence Carter and Jimmy Huges for inclusion in the subject package.

As I explained on the phone a last week, Warner Brothers is claiming <u>full ownership</u> for the track "Slip Away" by Clarence Carter. "Stand By Your Man" is performed by Candi Staton, not Clarence Carter as stated in your fax of May 12th. We have no contention to the ownership of the Candi Staton track and agree to the licensing in full understanding of Fame's ownership.

However, because of Warner's initial claim to ownership of the Clarence Carter track, as well as their willingness to take full liability of said track, we are obligated to settle all contracts and monies due for the master license through Warner Brothers Records. If you feel there is a discrepency you will need to settle directly with Warner. Their position on this issue is firm, therefore, we will proceed accordingly.

I apologise for any inconvenience and hope this does not in any way effect our agreement. Please contact me at the numbers listed above should you have any questions or problems concerning this information.

Thank you for all your consideration. I look forward to continued relations.

Very truly yours,

Dawn Van Patten
Sr. A&R Coordinator
CEMA Special Markets

# EXHIBIT "E"

# Cema

**SPECIAL MARKETS**

1750 North Vine Street
Hollywood, CA 90028-5274

(213) 960-4650
(213) 960-4666 Fax

December 9, 1994

Linda Hall
Fame Enterprises, Inc.
P.O.Box 2527
Muscleshoals, AL 35662

    Re:  **LEASE-IN AGREEMENT: CRI-SM-3053**
             **RIPETE/"Soul Patrol"**
             **SEL# 17881**

Dear Ms. Hall:

Enclosed please find one fully executed copy of the above referenced Agreement along with advance check# 1589 in the amount of $1,916.00.

If you have any questions regarding the aforementioned, please contact me at (213) 960-4661 at your earliest convenience.

Very truly yours,

Bradley J. Fisher
Manager, Business Affairs
CEMA Special Markets

encls.

cc:  F. Lopez

# EXHIBIT "F"

## A-G-R-E-E-M-E-N-T

Agreement made this twenty-fourth day of June, 1994, between CEMA Special Markets, a division of Capitol Records, Inc., 1750 North Vine Street, Hollywood, California 90028 (hereinafter "CSM") and **Fame Enterprises, Inc., P.O. Box 2527, Muscleshoals, Alabama 35662** (hereinafter "Licensor").

1. <u>Definitions</u>

1.01. "Master Recording(s)" shall mean such original recording(s) or duplicate of original recording(s) set forth on Exhibit "A".

1.02. "Record(s)" shall mean one (1) cassette and one (1) compact disc manufactured from the Master Recording(s) set forth on Exhibit "A" and other master recordings either owned or leased by CSM in a compilation entitled **"Soul Patrol"** which shall consist of twenty (20) selections on each cassette and twenty-four (24) selections on each compact disc.

1.03. "Term of this Agreement" shall mean the two (2) year period commencing July 1, 1994 and terminating June 30, 1996.

1.04. "Territory" shall mean the United States of America only.

1.05. "Base price" shall mean $9.98 per cassette and $13.98 per compact disc.

1.06 "Retail" shall mean regular retail only.

2. <u>Grant of Rights</u>

2.01. (a) Licensor grants to CSM the non-exclusive right, privilege and license, during the Term of this Agreement in the Territory, to use the Master Recording(s) in the manufacture of the Records as defined in paragraph 1.02 only, and not otherwise. INITIALS

(b) CSM shall manufacture the Records for sale by Ripete Records in the Territory through the means of retail only and not otherwise.

(c) Licensor warrants and represents to CSM that it has or will have all rights necessary to grant this license for the purpose specified above, without further payment by CSM for the use of the Master Recordings, except as expressly provided herein.

2.02. At CSM's request, Licensor agrees to ship to CSM, at an address designated by CSM, a duplicate master tape of each Master Recording. CSM shall pay Licensor promptly after being billed for the actual cost of dubbing said duplicate master tapes and for

packaging and shipping charges to the designated destination.

## 3. Limitations of Rights

3.01.    The license granted by Licensor hereunder is limited to the single use of the Master Recording(s) on the Records in the manner set forth in paragraph 2.01 above. Any and all other rights in connection with the Master Recording(s) are specifically reserved by Licensor. CSM warrants and represents that the Master Recording will not be edited without Licensor's prior written consent.

3.02.    CSM agrees that it will not sublicense any of the Master Recordings under this Agreement. CSM shall have the right to manufacture, distribute and sell Records on ~~label or such other label as it may designate~~ Ripete Records only. INITIALS

3.03.    As a condition precedent to the grant of rights to CSM hereunder, CSM shall obtain on its own behalf valid and currently effective mechanical copyright licenses for use of the copyrighted musical compositions embodied in the Master Recordings on the Records.

## 4. Royalties and Advances

4.01.    In consideration of the rights and license granted hereunder, pursuant to which CSM causes Records to be manufactured, CSM agrees to pay Licensor the sum of $.0798 per Master Recording cassette, and $.1118 per Master Recording per compact disc on one hundred percent (100%) of cassettes and compact discs manufactured and sold ("Earned Royalties"). CSM shall pay Licensor, upon the execution of this agreement, the sum of one thousand nine hundred sixteen dollars ($1,916.00) as a non-returnable advance against royalties based on a 10,000 unit guarantee. Said advances may be recouped from net sales at Earned Royalties rate set forth above and Earned Royalties shall be payable on net sales from and after such recoupment.

## 5. Artist, A.F. of M. and Copyright Payments

5.01.    Licensor shall be responsible for and shall pay any royalties to Licensor's artists which may become owing in connection with CSM's use of the Master Recording(s) licensed hereunder.

5.02.    CSM warrants and represents that it will pay and be solely responsible for (i) all payments which may be required to be made to the Music Performance Trust Fund and the Phonograph Record Manufacturer's Special Payments Fund (and to any similar fund based on sales which is established by collective bargaining agreements) arising out of the manufacture and sale of Records, (ii) all fees or royalties which may be required to be paid to the copyright owners of the musical compositions in connection with the manufacture, distribution and sale of Records, (iii) all excise taxes and other taxes (as fixed by law) for Records manufactured and sold hereunder including, but not limited to, such amounts, if any, which may be required to

be paid under the applicable provisions of any state and/or local, sales and/or use tax laws or regulations which impose a tax based upon any sums paid by CSM to Licensor, (iv) all payments which may become due to the AFTRA Pension and Welfare Fund to the extent that Licensor may be additionally liable therefor as a result of sales of Records, and (v) all re-use payments and fees required to be paid for the use of the Master Recording(s) and the names and likenesses of performers associated therewith in a radio or television advertisement.

6.    Trademarks, Trade Names, Names, Likenesses, Credits and Quality

6.01.    CSM may release the Records only under such trade names or marks as are owned by CSM or its designees. CSM agrees that it will not identify the Records with any of Licensor's trademarks or logotypes, or Licensor's name, except as provided in subparagraph 6.03 below.

6.02.    Subject to Article 6 hereof, Licensor grants CSM the right to use the names, likenesses of and biographical material concerning the performers who recorded the Master Recording, for advertising and trade purposes solely in connection with the sale and exploitation of the Records subject to the terms and conditions hereof.

6.03.    CSM shall imprint the copyright notice, symbols and wording as specified by Licensor in Exhibit "A" on the packaging of each Record. Any and all Records in whatever form manufactured by CSM shall bear an asterisk next to the title of each Master Recording licensed hereunder and the courtesy line as referenced on Exhibit "A".

6.04.    CSM warrants and agrees that the credits for Licensor's artist in connection with the Records and in any advertising thereof shall appear in substantially similar size, prominence and type style to the size, prominence and type style used in connection with the other artists whose performances are embodied on the Records and that the presentation of each artist's name shall be in alphabetical order or order based upon the artist's appearance on the Record.

6.05.    CSM shall deliver to Licensor two (2) copies of each of the Records authorized under the terms of this agreement.

7.    Statements and Payments

7.01.    CSM shall maintain full, true and accurate accounts with respect to all Records manufactured and will furnish Licensor with complete and accurate royalty statements of the number of Records manufactured and sold thereof, within ninety (90) days after each semi-annual accounting period (June and December) during which Records are manufactured and sold, such statements to be accompanied by payment of any royalties due as a result of such manufacturing and sale.

7.02.    CSM will permit Licensor or its designated agent or agents, upon

reasonable written notice to CSM, to audit CSM's applicable books and records and to make copies of portions thereof at CSM's principal place of business, for the purpose of verifying CSM's royalty payments, at reasonable times during regular business hours. In the event the calculation of royalty payments is determined by a computer based system, Licensor shall be permitted to examine the machine sensible data utilized by such system and the related documentation describing such system and CSM agrees to retain such data for at least two (2) years after the term hereof.

## 8. Warranties and Agreements by Licensor

8.01. Licensor warrants and agrees that it has the right and power to enter into and fully perform this agreement, to make the commitments it makes herein and has obtained all necessary licenses, permissions and consents. Licensor will at all times indemnify and hold harmless CSM from and against any and all claims, damages, liabilities, costs and expenses (including legal expenses and reasonable counsel fees) arising out of ~~taxxaexxxxxarxtxexxxxxx~~ ~~Recordingsxxxorx(bx~~ any breach by Licensor of any warranty or agreement made by Licensor herein which has resulted in a judgment against CSM or which has been settled with Licensor's consent. Licensor will reimburse CSM on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which CSM is entitled to be indemnified. CSM shall notify Licensor of any such claim and Licensor shall have the right, at its expense, to participate in the defense thereof.

## 9. Ownership

9.01. All Master Recordings licensed hereunder, all performances embodied thereon and all copyrights and other rights in and to the Master Recordings are the sole property of Licensor, subject only to the right granted to CSM herein to make reproductions pursuant to the terms of this agreement. At the termination or expiration of the term of this agreement, all duplicate master tapes and other reproducing devices furnished to CSM hereunder shall, at Licensor's election, be returned to Licensor at CSM's expense or be destroyed by CSM, in which event CSM shall furnish to Licensor an affidavit of destruction executed by an authorized signatory of CSM. CSM warrants and agrees that CSM will not, directly or indirectly, sell or otherwise dispose of, pledge, mortgage or in any way encumber the duplicate master tapes and CSM shall similarly bind all parties dealing with property.

## 10. Union Signatory

10.01. CSM warrants and agrees that it is, and during the Term of this Agreement will continue to be, a signatory to the American Federation of Musicians (AFM) Phonograph Record Labor Agreement, the Special Payments Fund Agreement and Phonograph Record Trust Agreement, all of December, 1981, and the American Federation of Television and Radio Artists (AFTRA) National Code of Fair Practice for Phonograph Recordings and that it will fully comply with the terms and conditions of all such agreements. Those provisions of any such agreements which are required, by the terms of such agreement, to be included in this

Agreement shall be deemed incorporated herein.

11.   Notices

11.01.        Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by registered or certified mail or Federal Express or similar carrier (pre-paid) at the respective addresses hereinabove set forth, or such other address or addresses as may be designated by either party.  Such notices shall be deemed given when mailed or delivered to a Federal Express office, except that notice of change of address shall be effective only from the date of its receipt.

12.   Assignment

12.01.        Licensor may assign this Agreement or its rights hereunder in whole or in part to any subsidiary, affiliated or controlling corporation or to any person owning or acquiring a substantial portion of the stock or assets of Licensor, and the Agreement or such rights may be assigned by any assignee thereof; provided, however, that any such assignment shall not relieve Licensor any of its obligations hereunder.

13.   Force Majeure

13.01.        If, due wholly or partly to any labor controversy or adjustment thereof, or any cause not entirely within CSM's control or which CSM could not, with reasonable diligence, have avoided, CSM is materially hampered in the distribution or sale of the Records, then, for the duration of such contingency, CSM may suspend the Term of this Agreement by notice to Licensor.  If such impossibility to perform continues for ninety (90) days, then Licensor may terminate the term of this Agreement by written notice to CSM.  Nothing contained herein shall relieve CSM of its obligation hereunder to pay royalties and render statements to Licensor.

14.   Default by CSM

14.01.        The occurrence of the following events shall be deemed material breaches and defaults by CSM hereunder:

(a)  If CSM fails to render statements and/or make royalty payments to Licensor; and/or

(b)  If CSM fails to fulfill any of its material obligations hereunder and such failure is not cured within thirty (30) business days of written notice from Licensor thereof; and/or

(c)  In the event of CSM's dissolution or the liquidation of CSM's assets, or the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization, by, for

or against CSM, or in the event of the appointment of a receiver or a trustee for all or a portion of its property, or in the event that CSM shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent; and/or

(d) If CSM sublicenses any rights licensed hereunder without Licensor's written consent or distributes or sells Records through any distribution channels or by promotional means other than those set forth in subparagraph 2.01 above, or beyond the dates for which the rights herein are licensed to CSM.

15. **Miscellaneous**

15.01. This agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by an officer of Licensor and CSM. A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

15.02. This agreement has been entered into in the State of California, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance, or breach of this agreement. Any process in any action or proceeding commenced in the courts of the State of California or elsewhere arising out of any such claim, dispute or disagreement, may, among other methods, be served upon CSM by delivering or mailing the same via registered or certified mail, addressed to CSM at the address first above written or such other address as CSM may designate pursuant to paragraph 12 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of California or the jurisdiction in which such action or proceeding may be commenced.

15.03. This agreement shall not become effective until executed by all proposed parties hereto.

ACCEPTED AND AGREED:

Fame Enterprises, Inc.
Fed.ID# 63-0571960

By: _Linda Hall_
An Authorized Signatory

CEMA SPECIAL MARKETS, a division
of CAPITOL RECORDS, INC.

By: _____
Vice President

## EXHIBIT A

(Attached to and made a part of the agreement, dated June 24, 1994, between CEMA Special Markets and Fame Enterprises, Inc., in reference to the selections listed below.)

**TITLE OF SELECTION:**    "Soul Patrol"

**SELECTION NUMBER:**    S21/S41 17881

| MASTER: | ARTIST | p-DATE |
|---|---|---|
| STEAL AWAY | JIMMY HUGHES | None |
| STAND BY YOUR MAN | CANDY STATON | None (appears on CD only) |

**COURTESY LINE:**

Jimmy Hughes and Candy Staton appear courtesy of Fame Enterprises, Inc.

# EXHIBIT "G"

# EMI-Capitol Music

### Special Markets

DATE: __May 10, 1996__

TO: __Rodney Hall__                    COMPANY: __Fame Music Enterprises__

FROM: __Brad Fisher__                  SENDER'S DIRECT NUMBER 213-960-4661

RE: __Soul Patrol__

FAX NUMBER __205-381-6337__

NUMBER OF PAGES INCLUDING COVER SHEET __2__.
IF TOTAL NUMBER OF PAGES ARE NOT RECEIVED OR ARE ILLEGIBLE, PLEASE
CALL THE DIRECT DIAL NUMBER LISTED ABOVE.

Dear Mr. Hall:

As we discussed in our conversation today, the following is another
request for the extension of the master use license for two of your
tracks in the package we manufacture for Ripete Records called
"Soul Patrol".

For your information, all other licensors have agreed to extend the
terms of their licenses. Your tracks "Steal Away" and "Stand By
Your Man" are key to this project. If you agree to extend the
license, just sign the extension and fax it back to me at 213-960-
4666. If you have any questions, I can be reached at 213-960-4661.

Thank you in advance for your cooperation.

Very truly yours,

Bradley J. Fisher
Manager, Business Affairs
EMI-Capitol Music Special Markets

# EMI-Capitol Music

### Special Markets

May 10, 1996

Mr. Rodney Hall                    **VIA FACSIMILE**
Fame Enterprises, Inc.
P.O. Box 2527
Muscleshoals, AL 35662

RE: "Soul Patrol"/RIPETE
    SEL# 17881; Dated June 24, 1994
    EMI-Capitol Music Contract No.: CRI-SM-3053
    "Steal Away"/JIMMY HUGHES
    "Stand By Your Man"/CANDY STATON

Dear Mr. Hall:

We request permission to extend the term of the above referenced
License for a period of two (2) years commencing on July 1, 1996.
In consideration of such approval, and contingent upon receiving
permission from all participating licensors, we can offer an
advance against five thousand (5,000) units. These tracks are
licensed at the rates of $.0798 Tape; $.1118 CD per track per unit.

If this is acceptable, please forward a signed confirmation of this
extension request at your earliest convenience. Upon receipt, I
will cause an advance check in the amount of $798.00 to be
generated and forwarded to you.

Please note we have recently changed our name from CEMA Special
Markets. If you have any questions regarding this matter, please
contact me at your earliest convenience. Thank you for your
cooperation and consideration.

Very truly yours,                    ACCEPTED & AGREED
                                     FAME ENTERPRISES, INC.

Bradley J Fisher                     By: _____
Business Affairs,                        An Authorized Signatory
EMI-Capitol Music Special Markets

# EXHIBIT "H"

# VIA FACSIMILE:  (205) 381-6337
## TOTAL NUMBER OF PAGES (INCLUDING COVER): 5

Date:              October 29, 1996

To:                Rick Hall
                   c/o Fame Recording Studio

From:              Gabriella Tieppo
                   Business Affairs
                   EMI Records
                   1290 Avenue of the Americas, 38th Fl.
                   New York, NY  10104


                   [212] 492-1822 Direct Phone
                   [212] 492-1888 Fax Number

The information contained in this facsimile message is private, proprietary, privileged and confidential, and is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, disclosure or copying of this communication, or any portion of this communication, is strictly prohibited.

If you have received this communication by error, please immediately notify us by telephone, and return the original message to us at the above address via the U.S. postal service.  Thank you.

1290 Avenue of the Americas
New York, NY 10104
Tel 212 492 1700
Fax 212 245 4115

# **EMI Records**

Direct Fax: (212) 492-1888

Sent VIA FACSIMILE & CERTIFIED MAIL

October 29, 1996

Rick Hall
c/o Fame Recording Studio
603 East Avalon Ave.
Muscle Shoals, AL 35662

RE: HEART OF SOUL: CANDI STATON

Dear Rick:

EMI Records is planning to release the above package as part of
our continuing Heart of Soul series. This mid-priced CD package
is scheduled for retail release in January 1997. Our intention
is to use the original artwork from a previous Candi Staton album
(attached).

The track listing consisting of 16 tracks but not necessarily in
sequence is also attached. Please indicate your approval by
signing in the space provided below.

Thank you in advance for your consideration and prompt response
to this request.

Very truly yours,                                      Approved:

Gabriella Tieppo
Business Affairs

Gabriella
Candi Staton
cover art



...an Intense, serious look; lips slightly parted, warm and generous...smiling with soft and steady eyes... intense inner glow—a categorically, breathtakingly beautiful girl. A black girl.

# Stand By Your Man



Candi is a star—which is funny. Really. Because she's not at all like a star. She's a little girl and a woman. She's sweet... real...a female woman who breathes the exhilaration and glory of being. □ Candi Staton...everything nicely packaged in talented womanly warmth. She radiates the energy of a woman not afraid to be every bit of herself...soft and sure of her femaleness. She lets herself feel and sing the beauty...the entirely inside herself. □ She sings from the depth of her soul with that sweet, sweet feeling...a gospel intensity; rhythmic freedom and drive—a human, realistic vocal style and honest gut-emotion. Only a girl like her could make this beautiful music. □ Candi's "Stand By Your Man" is a big hit...of course. One of the reasons is that she believes it—the words... the music. It's her. Like: "Sometimes it's hard to be a woman, giving all your love to just one man...doing things you don't understand. But... you'll forgive him...If you love him be proud of him because after all, he's just a man. Stand by your man... give him two arms to cling to and something warm to come to when the nights are cold and lonely..." □ Oh yes! Not quite what Woman's Lib would have her say. But all right! She has it. Call it life. Call it soul. You can see it in her glowingly beautiful face...hear it in her purely human voice. □ Candi Staton...there's a whole album of it here!

**Side one**
STAND BY YOUR MAN
E. Sherrill, Tammy

NOW CAN I PUT OUT THE FLAME
(What You Want The Fire Burning)
R. Holland, Butler

I'M JUST A PRISONER (Of Your Good Lovin')
G. Jackson, J. Norris

MR. AND MRS. UNTRUE
T. Brock, Lacey

TOO HURT TO CRY
G. Jackson, Brock

**Side two**
HE CALLED ME BABY
Harlan Howard

SWEET FEELING
F. Brock, Killen, called, Butler

TO HEAR YOU SAY YOU'RE MINE
Lacy, Brock

WHAT WOULD BECOME OF ME
Payne, Brock

FREEDOM IS JUST BEYOND THE DOOR
G. Jackson, Emily, et

Produced and Arranged by RICK HALL




Producer: Leo Sacks
Tentative Repertoire 10/7/96

Album masters: "Stand By Your Man" (Fame 4202) and "I'm Just A Prisoner" (Fame LP)

Freedom Is Just Beyond The Door
How Can I Put Out The Flame (When You Keep The Fire Burning)
To Hear You Say You're Mine
What Would Become of Me
I'd Rather Be An Old Man's Sweetheart (Than A Young Man's Fool)
Never In Public
I'm Just A Prisoner (of Your Good Lovin')
Sweet Feeling
Stand By Your Man
He Called Me Baby
Mr. and Mrs. Untrue
Too Hurt To Cry
In The Ghetto
Lovin' You, Lovin' Me
Do It In The Name of Love
Something's Burning
Love Chain

Young Hearts Run Free (Warner Brothers)

(818) 275 4055

VP either
Warner's
Brother

Fame records Masters
Rick Hall

# EXHIBIT "I"

# C O V E R
## S H E E T

# FAX

| | |
|---|---|
| **To:** | Rick Hall, President |
| | Fame Enterprises, Inc. |
| **Fax #:** | (205) 381-6337 |
| **Subject:** | "Heart of Soul: Candi Staton" |
| **Date:** | December 17, 1996 |
| **Pages:** | **5**, including this cover sheet. |

**COMMENTS:**

Please call Vanessa Gullett at (205) 383-4448, extension 6, if you do not receive this facsimile in its entirety.

From the desk of ...

**G. Rick Hall**
Attorney at Law
Almon, McAlister, Baccus & Hall, L.L.C.
Post Office Box 148
Tuscumbia, Alabama 35674

(205) 383-4448
Fax: (205) 383-6523

VINCENT McALISTER
STEVE A BACCUS
G. RICK HALL

LAW OFFICES OF

## ALMON, McALISTER, BACCUS & HALL, L.L.C.

CLOPPER ALMON (1895-1966)

COUNSEL
GORMAN R JONES, JR

106 WEST THIRD STREET
P.O. BOX 148
TUSCUMBIA, ALABAMA 35674
205-383-4446

TELECOPIER
205-383-6523

December 17, 1996

## VIA FACSIMILE AND FEDERAL EXPRESS

Ms. Gabriella Tieppo
Business Affairs
EMI Records
1290 Avenue of the Americas
New York, New York 10104

Dear Ms. Tieppo:

My client Rick Hall, at Fame Enterprises, Inc., f/k/a Fame Productions, Inc., has informed me of your correspondence seeking approval to release a package entitled "Heart of Soul: Candi Staton," which includes several masters owned by Fame Enterprises, Inc. As you have previously been orally informed, Fame Enterprises, Inc. does not consent to the planned release of masters it owns on the proposed CD package. Specifically, Fame owns all masters on the proposed CD package other than "In the Ghetto," "Lovin' You Lovin' Me," "Do It in the Name of Love," "Something's Burning," "Love Chain," and "Young Hearts Run Free," all of which are owned by Warner Bros.

I have enclosed herein for your file a letter dated June 17, 1971, from Alex J. Migliara acting for Fame in which he informs the appropriate person at Capitol Records, Inc. of Fame's exercise of its option provided in contract number 4842 and contract number 5247 with Capitol to repurchase masters delivered under these contracts between Fame Productions, Inc. and Capitol Records. All of the masters, other than the ones identified above, that you propose to release on the "Heart of Soul: Candi Staton" CD package are covered under this repurchase option which was exercised by Fame. Also, you should know that affiliates of Capitol Records, Inc. have on several occasions acknowledged Fame's ownership of these Candi Staton masters. For example, I have enclosed herein a letter dated May 16, 1994, from Cema Special Markets in which its representative agreed that "Stand By Your Man" as performed by Staton will be licensed from Fame "in full understanding of Fame's ownership."

Ms. Gabriella Tieppo
December 17, 1996
Page 2


Please call me if you have any questions. However, you should know that we will fully protect
Fame's rights and remedies, and will not tolerate any unauthorized use of its masters as you
propose.

Sincerely yours,

G. Rick Hall

GRH/vlg
enclosures
cc:     Rick Hall, President
          Fame Enterprises, Inc.

CRAFT, PESCE, MIGLIARA & CHIOZZA

HENRY CRAFT
VICE PESCE
ALEX J. MIGLIARA
LOUIS CHIOZZA, JR.

CABLE ADDRESS
"PAMCRAFT"

ATTORNEYS AT LAW
202 ADAMS AVENUE
MEMPHIS, TENN. 38103

June 17, 1971

Mr. Charles Tillinghast
Secretary - Capitol Records, Inc.
The Capitol Tower
Hollywood, California  90028

REGISTERED - RETURN RECEIPT REQUESTED

Re:   Fame Productions, Inc., -
      Capitol Records, Inc.
      Contract #4842
      Date:  May 6, 1969
      Contract #5247
      Date:  August 26, 1970

Dear Mr. Tillinghast:

This is to advise that Fame Productions, Inc.,
exercises its right to repurchase all master re-
cordings heretofore delivered to Capitol under the
referred to contracts and all rights pertinent to
said masters, as same is provided under paragraphs
18 and 20 respectively of the referenced contracts.

Yours very truly,

ALEX J. MIGLIARA

AJM/pc

cc:   Mr. B. Menon,
      President Capitol Records, Inc.

      Mr. Elliot Chaum, Vice President
      Business Affairs, Capitol Records, Inc.

      Mr. Rick Hall, President
      Fame Productions, Inc.

FAX ♪ FAX ♪ FAX ♪ FAX ♪ FAX ♪ FAX

*Cema*

*Special Markets*

*Dawn Van Patten*

213-960-4658 Phone

213-960-4666 Fax

**DATE:**     May 16, 1994

**TO:**       Rick Hall
              Fame Records

**FAX:**      (205) 381-6337

**SUBJECT:**  "Soul Patrol"/Ripete Records

Rick:

I am in receipt of your fax to Frank Lopez regarding publisher info for Clarence Carter and Jimmy Huges for inclusion in the subject package.

As I explained on the phone a last week, Warner Brothers is claiming <u>full ownership</u> for the track "Slip Away" by Clarence Carter. "Stand By Your Man" is performed by Candi Staton, not Clarence Carter as stated in your fax of May 12th. We have no contention to the ownership of the Candi Staton track and agree to the licensing in full understanding of Fame's ownership.

However, because of Warner's initial claim to ownership of the Clarence Carter track, as well as their willingness to take full liability of said track, we are obligated to settle all contracts and monies due for the master license through Warner Brothers Records. If you feel there is a discrepency you will need to settle directly with Warner. Their position on this issue is firm, therefore, we will proceed accordingly.

I apologize for any inconvenience and hope this does not in any way effect our agreement. Please contact me at the numbers listed above should you have any questions or problems concerning this information.

Thank you for all your consideration. I look forward to continued relations.

Very truly yours,

Dawn Van Patten
Sr. A&R Coordinator
CEMA Special Markets

# EXHIBIT "J"



Fame Music Enterprises, Inc.
Fame Productions, Inc.
Fame Recording Studios, Inc.
Fame Publishing Co., Inc.
Rick Hall Music, Inc.

RICK HALL
President



Thursday, March 11, 1999

Julian French
EMI UK
43 Brook Green 1st Floor
London, UK  SW18 1EZ

Dear Julian:

I was told by John Ridley recently that EMI UK's subsidiary Stateside is working on a Candi Staton compilation CD. John is doing the liner notes for the project.  Upon seeing the track list I noticed that most of the cd was masters owned by FAME Records.

Julian, we have not received a request to license these masters.  I must ask you to stop any plans for this Candi Staton CD.  I have enclosed a list of these masters that are owned by FAME. Please contact me as soon as possible regarding the use of these masters.

Sincerely,

Rodney Hall
FAME Records

CANDI STATON FAME MASTERS
INCLUDED ON PROPOSED STATESIDE CD

1. The best thing you ever had

2. I'd rather be an old man's sweetheart

3. Evidence

4. I'm just a prisoner

5. He called me baby

6. Another man's woman another woman's man

7. Too hurt to cry

8. Sweet feeling

9. Freedom is just beyond the door

10. Do your duty

11. Never in public

12. Stand by your man

13. How can I put out the flame

14. For you

15. Get it when I want it

16. Heart on a string

17. You don't love me no more

18. What would become of me

19. That's how strong my love is

# EXHIBIT "K"

**EMI**

EMI Records UK
EMI House
43 Brook Green
London W6 7EF

Telephone 0171 605 5000
Business Affairs,
Fax 0171 605 5140

**TO:** Rodney Hall
Fame Records

**FAX:** 001 205 381 6337

**PAGES:** 1

**DATE:** 15 March 1999

**FROM:** Julian French

Dear Rodney

## CANDI STATON MASTERS

Thanks for the fax dated 11 March.

I am not aware of the failure to licence in recordings and have copied to Emma and Nigel so that they can clarify the background here. I will revert once I have spoken to them.

Many thanks.

Yours sincerely

JULIAN FRENCH
Director of Business Affairs

cc: Nigel Reeve
Emma Murray

# EXHIBIT "L"

# International Commercial Marketing



| | | |
|---|---|---|
| Date | : | 17th March 1999 |
| From | : | Keith Stevenson<br>EMI Business Affairs |
| To | : | Rodney Hall<br>Fame Records |
| Re | : | "Candi Staton - Southern Soul Masters" |
| Fax No | : | 001-256-381-6337 |
| Pages | : | 3 |

EMI International
EMI House
43 Brook Green
London W6 7EF

Telephone 0171 605 5000
Fax 0171 605 5176

---

## SUBJECT TO CONTRACT

Dear Rodney,

### Re: "Candi Staton"

EMI Catalogue wish to release an album devoted to Candi Staton's years with the "Fame" label, provisionally entitled "Southern Soul Masters". It is proposed that this album be released at mid price, via normal retail outlets from May 1999. A full list of the tracks that we wish to licence from you is attached. Terms proposed, which we hope that you will consider favourably are as follows.

| | | |
|---|---|---|
| Term | : | 5 years with 6 months sell off |
| Territory | : | UK & Eire |
| Format | : | CD only |
| Price category | : | Mid CD £5.70 (dealer price) |
| Royalty rate | : | 16% based on published price to dealer |
| Advance | : | £2,000 |
| Total tracks | : | 26 |
| Sales Estimate | : | 5,000 units |
| Release date | : | 4th May 1999. |

If this proposed release is acceptable to you upon the above terms I would be most grateful to receive a signed copy of this FAX returned to 0171-605-5176. If you have any comments or questions please don't hesitate to contact me.

Kind regards,

Keith Stevenson

**READ AND AGREED**

Signed_____  Date_____

Rodney Hall on behalf of Fame Records

## _Track List "Candi Staton - Southern Soul Masters"_

1. The Best Thing You Ever Had
2. I'd rather Be an Old Man's Sweetheart (Than A Young Man's Fool)
3. Evidence
4. I'm Just A Prisoner (Of Your Good Lovin')
5. He Called Me Baby, Baby
6. Lovin' You, Lovin' Me
7. In The Ghetto
8. Another Man's woman, Another Woman's Man
9. Too Hurt To Cry
10. Sweet Feeling
11. Freedom Is Just Beyond The door
12. Do it In The Name Of Love
13. Wanted : Lover
14. Do Your Duty
15. Never In Public
16. Black Mail
17. Stand By Your Man
18. How Can I Put Out the Flame
19. For You
20. I'm Gonna Hold On (To What I Got this Time)
21. Get It When I Want It
22. Heart On A String
23. You Don't Love Me No More
24. Darling You're Al That I Had
25. What Would Become Of Me
26. That's How Strong My Love Is

We propose to sequence the tracks as above if the licence is granted.

# EXHIBIT "M"



Fame Music Enterprises, Inc.
Fame Productions, Inc.
Fame Recording Studios, Inc.
Fame Publishing Co., Inc.
Rick Hall Music, Inc.

RICK HALL
President

Friday, March 19, 1999

Keith Stevenson
EMI UK
43 Brook Green 1st Floor
London, UK  SW18 1EZ

Dear Keith:

I am in receipt of you fax dated March 17th regarding the Candi Staton release.  We have considered your proposal and at this time we are not interested in releasing a mid priced CD on Candi Staton.  This material is some of the best material in our small catalogue.  None of the FAME masters have been released on CD, therefore we do not believe a mid-priced CD would be advantageous to FAME.  With this in mind we cannot grant you a license under your proposed terms.

Thank you for your interest in the FAME catalogue.

Sincerely,

Rodney Hall

2

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

    PLAINTIFFS,

VS.

    CASE NO.:  CV-2005 _124_

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

    *NVH*

    DEFENDANTS.

---

## SUMMONS

---

**NOTICE TO:** *N*    Capitol Records, Inc.
c/o James M. Scott or Lister L. Hill
57 Adams Avenue
Montgomery, Alabama 36104-4001

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_\_    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

  **X**    This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

          By:_____

_____    _____
DATE                CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_\_    Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_\_    I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____        _____
DATE                  SERVER SIGNATURE

ADDRESS
OF SERVER _____
_____    _____
_____    Type of Process Server

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

     PLAINTIFFS,

VS.                                      CASE NO. :   CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

     DEFENDANTS.

---

## SUMMONS

---

NOTICE TO:   ᐁ2     EMI Group, Inc.
                        304 Park Avenue South
                        New York, New York 10010

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C. 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_     TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

\_X\_     This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

                                                                                    By:_____

---
DATE                  CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_     Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_     I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

---
DATE

ADDRESS
OF SERVER _____

_____

                                   SERVER SIGNATURE

                                   Type of Process Server

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

     PLAINTIFFS,

VS.                                CASE NO.:   CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

     DEFENDANTS.

---

## SUMMONS

---

**NOTICE TO:**   Δ³      EMI Records
                         304 Park Avenue South
                         New York, New York 10010

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA 74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_\_     TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:    You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

 **X**     This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

                                                        By:_____

_____       _____
DATE                       CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_\_     Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_\_     I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____
DATE                                  SERVER SIGNATURE

ADDRESS
OF SERVER _____

_____                 Type of Process Server

_____

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

     PLAINTIFFS,

VS.

                            CASE NO. :  CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC., ET AL,

     DEFENDANTS.

---

### SUMMONS

**NOTICE TO:**  EMI Music, Inc.
304 Park Avenue South
New York, New York 10010

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

 **X**   This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

_____    _____  By:_____
DATE                   CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_    Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_    I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____    _____
DATE                            SERVER SIGNATURE

ADDRESS
OF SERVER _____

_____    _____
                                Type of Process Server

*(stamp:)* FILED IN OFFICE 2005 MAR 18 PM — PHILLIP BOWEN CIRCUIT COURT

## IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

      PLAINTIFFS,

VS.

                                       CASE NO.:  CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

      DEFENDANTS.

---

## SUMMONS

---

**NOTICE TO:**       EMI Group North America, Inc.
                    304 Park Avenue South
                    New York, New York 10010

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

**___**     TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

**_X_**    This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

_____      _____    By:_____
DATE                    CLERK/REGISTER

RETURN ON SERVICE:

**___**    Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

**___**    I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____
DATE                            _____
                                 SERVER SIGNATURE

ADDRESS
OF SERVER _____
_____         _____
                                   Type of Process Server

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

     PLAINTIFFS,

VS.

     CASE NO. :  CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

     DEFENDANTS.

---

**SUMMONS**

---

**NOTICE TO**:  ᴵᴺ Sunburst Records
              4001 Holmes Avenue NW
              Huntsville, Alabama 35816

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74**.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_  TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:  You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

**X**  This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

---

                                            By:_____

DATE               CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_  Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_  I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____ .

---

DATE _____

ADDRESS
OF SERVER _____

_____

SERVER SIGNATURE

_____

Type of Process Server

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

     PLAINTIFFS,

VS.                              CASE NO. :  CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

     DEFENDANTS.

---

## SUMMONS

NOTICE TO:
     Bay Sound, Inc.
     c/o William J. Francis, III
     221 Highway 90, Suite 108
     Daphne, Alabama 36526

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA 74**.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

 **X**    This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

_____    _____  By:_____

DATE                CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_    Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_    I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____

DATE                          SERVER SIGNATURE

ADDRESS
OF SERVER _____

_____    _____

                                    Type of Process Server

*(Stamp, vertically along right margin:)* FILED IN OFFICE CIRCUIT COURT CLERK 2005 MAR 18 PM 3 PHILLIP BOWLIN

# IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

     PLAINTIFFS,

VS.

                                               CASE NO. :   CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

     DEFENDANTS.

---

## SUMMONS

---

**NOTICE TO:**  ᴬ¹⁰    The Sound Shop, Inc.
                              Quintard Mall
                              700 Quintard Drive
                              Oxford, Alabama 36203

*[vertical stamp, right margin: PHILLIP BOWLING / CIRCUIT COURT CLERK / 2005 MAR 18 PM / FILED IN OFFICE]*

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

____   TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

**_X_**   This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

                                                                            By:_____

_____      _____
DATE                          CLERK/REGISTER

RETURN ON SERVICE:

____   Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

____   I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____
DATE                                       SERVER SIGNATURE

ADDRESS
OF SERVER _____
_____           _____
                                   Type of Process Server

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

     PLAINTIFFS,

VS.

                                             CASE NO. :  CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

     DEFENDANTS.

---

**SUMMONS**

---

**NOTICE TO:**     Sound Shop
                    Quintard Mall
                    700 Quintard Drive
                    Oxford, Alabama 36203

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C. 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA 74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:   You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

**X**    This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

                                                 By:_____

_____    _____
DATE                       CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_    Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_    I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____           _____
DATE                            SERVER SIGNATURE

ADDRESS
OF SERVER _____
_____           _____
_____           Type of Process Server

FILED IN CIRCUIT COURT PHILLIP B. 2005 MAR 18

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

      PLAINTIFFS,

VS.

                                   CASE NO. :  CV-2005 _____

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

      DEFENDANTS.

---

## SUMMONS

**NOTICE TO:**  ala  Charlemagne Record Exchange, Inc.
c/o Gary Bourgeois
1924½ 11th Avenue South
Birmingham, Alabama 35205

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74**.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

\_\_\_    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure:  You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

 **X**    This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

_____    _____  By:_____
DATE                    CLERK/REGISTER

RETURN ON SERVICE:

\_\_\_    Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

\_\_\_    I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _____.

_____
DATE                           SERVER SIGNATURE

ADDRESS
OF SERVER _____

_____    Type of Process Server

FILED IN OFFICE
2005 MAR 18 PM 3:
PHILLIP BOWLING
CIRCUIT COURT CLERK

3

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E.
(RICK) HALL,

      PLAINTIFFS,

VS.

CASE NO.:_____

CAPITOL RECORDS, INC.; EMI GROUP, INC.;
EMI RECORDS; EMI MUSIC, INC.; EMI GROUP
NORTH AMERICA, INC.; PEGASUS RECORDS;
SUNBURST RECORDS; LASER'S EDGE; BAY
SOUND, INC.; THE SOUND SHOP, INC.; SOUND
SHOP; CHARLEMAGNE RECORD EXCHANGE,
INC., and DEFENDANTS A, B, C, and D, as more
specifically described in the body of the Complaint,

      DEFENDANTS.

2005 MAR 18 PM 3:43
PHILLIP BOWLING
CIRCUIT COURT CLERK
FILED IN OFFICE

## <u>NOTICE OF SERVICE OF DISCOVERY DOCUMENTS</u>

TO:   Phillip Bowling, Clerk
      Colbert County Courthouse
      Tuscumbia, Alabama 35674

     PLEASE TAKE NOTICE that the following discovery documents were served on behalf of the Plaintiffs:

1.    Plaintiffs' First Interrogatories to Certain Defendants, Capitol Records, Inc.; EMI Group, Inc.; EMI Records; EMI Music, Inc; and EMI Group North America, Inc.

2.    Plaintiffs' First Requests for Production to Certain Defendants, Capitol Records, Inc.; EMI Group, Inc.; EMI Records; EMI Music, Inc; and EMI Group North America, Inc.

_____
G. RICK HALL (HAL043)
Hall & Tanner, P.C.
Attorneys for the Plaintiff
201 North Water Street
Tuscumbia, Alabama 35674
(256) 381-7750

## CERTIFICATE OF SERVICE

I hereby certify that I have attached a copy of the foregoing to the Summons and Complaint to be served on each defendant this the 18th day of March 2005.

G. RICK HALL (HAL043)

4

ALABAMA JUDICIAL DATA CENTER
COLBERT     COUNTY
SERVICE NOTICE

CV 2005 000124. 00
HAROLD V. HUGHSTON,

IN THE CIRCUIT COURT OF COLBERT     COUNTY

FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL         D001

HALL G RICK                          CASE NUMBER: CV 2005 000124 00
ATTORNEY AT LAW                      PARTY NUMBER: C001
201 NORTH WATER STREET
TUSCUMBIA  AL  35674

YOUR ATTORNEY CODE IS HAL043

THE SUMMONS AND COMPLAINT            WAS SERVED ON CAPITOL RECORDS INC %
ON 03/23/2005 BY: CERTIFIED MAIL.

CONCERNING: CAPITOL RECORDS INC %
            JAMES SCOTT OR LISTER HIL
            57 ADAMS AVENUE
            MONTGOMERY      , AL  36104-4001

DATE: 03/29/2005  CLERK: PHILLIP BOWLING
                  COLBERT COUNTY COURTHOUSE
                  TUSCUMBIA  AL  35674
                  (256)386-8513

5

ALABAMA JUDICIAL DATA CENTER
COLBERT     COUNTY
SERVICE NOTICE

CV 2005 000124. 00
HAROLD V. HUGHSTON,

```
|--------------------------------------------------------------------------|
|                                                                          |
|             IN THE CIRCUIT  COURT OF  COLBERT     COUNTY                  |
|                                                                          |
|  FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL         D007|  |
|                                                                          |
|                                                                          |
|        HALL G RICK                        CASE NUMBER: CV 2005 000124 00  |
|        ATTORNEY AT LAW                    PARTY NUMBER: C001              |
|        201 NORTH WATER STREET                                            |
|        TUSCUMBIA  AL  35674                                             |
|                                                                          |
|        YOUR ATTORNEY CODE IS HAL043                                      |
|                                                                          |
|  THE SUMMONS AND COMPLAINT            WAS SERVED ON SUNBURST RECORDS      |
|  ON 03/22/2005 BY: CERTIFIED MAIL.                                       |
|                                                                          |
|        CONCERNING: SUNBURST RECORDS                                      |
|                    4001 HOLMES AVE. N.W.                                 |
|                                                                          |
|                    HUNTSVILLE      , AL  35816-0000                      |
|                                                                          |
|                                                                          |
|                                                                          |
|                                                                          |
|                                                                          |
|                                                                          |
|                                                                          |
|                                                                          |
|                                                                          |
|             DATE: 03/29/2005   CLERK: PHILLIP BOWLING                    |
|                                 COLBERT COUNTY COURTHOUSE                 |
|                                 TUSCUMBIA  AL   35674                     |
|                                 (256)386-8513                            |
|                                                                          |
|--------------------------------------------------------------------------|
```

OPERATOR: PAW
PREPARED: 03/29/2005

6

AVS0702

---

IN THE CIRCUIT COURT OF COLBERT    COUNTY

FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL         DO12

HALL G RICK                        CASE NUMBER: CV 2005 000124 00
ATTORNEY AT LAW                    PARTY NUMBER: C001
201 NORTH WATER STREET
TUSCUMBIA  AL  35674

YOUR ATTORNEY CODE IS HAL043

THE SUMMONS AND COMPLAINT          WAS SERVED ON CHARLEMAGNE RECORAD EX
ON 03/22/2005 BY: CERTIFIED MAIL.

CONCERNING: CHARLEMAGNE RECORAD EXCHANGE
            % GARY BOURGEOIS
            1924 1/2 11TH AVE. S.
            BIRMINGHAM    , AL  35205-0000

DATE: 03/29/2005  CLERK: PHILLIP BOWLING
                  COLBERT COUNTY COURTHOUSE
                  TUSCUMBIA  AL   35674
                  (256)386-8513

---

OPERATOR: PAW
PREPARED: 03/29/2005

7

AVS0702

CV 2005 000124. 00
HAROLD V. HUGHSTON,

---

IN THE CIRCUIT COURT OF COLBERT      COUNTY

FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL          DOO5

HALL G RICK                          CASE NUMBER: CV 2005 000124 00
ATTORNEY AT LAW                      PARTY NUMBER: COO1
201 NORTH WATER STREET
TUSCUMBIA  AL  35674

YOUR ATTORNEY CODE IS HAL043

THE SUMMONS AND COMPLAINT          WAS SERVED ON EMI GROUP NORTH AMERIC
ON 03/23/2005 BY: CERTIFIED MAIL.

CONCERNING: EMI GROUP NORTH AMERICA INC.
            304 PARK AVENUE SOUTH

            NEW YORK       , NY  10010-0000

DATE: 03/31/2005  CLERK: PHILLIP BOWLING
                         COLBERT COUNTY COURTHOUSE
                         TUSCUMBIA  AL   35674
                         (256)386-8513

---

OPERATOR: PAW
PREPARED: 03/31/2005

8

AVS0702

CV 2005 000124.00
HAROLD V. HUGHSTON,

```
|------------------------------------------------------------------------|
|                                                                        |
|          IN THE CIRCUIT  COURT OF  COLBERT      COUNTY                  |
|                                                                        |
|   FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL       D004  |
|                                                                        |
|                                                                        |
|        HALL G RICK                     CASE NUMBER: CV 2005 000124 00   |
|        ATTORNEY AT LAW                 PARTY NUMBER:C001                |
|        201 NORTH WATER STREET                                          |
|        TUSCUMBIA  AL   35674                                           |
|                                                                        |
|        YOUR ATTORNEY CODE IS HAL043                                    |
|                                                                        |
|  THE SUMMONS AND COMPLAINT             WAS SERVED ON EMI MUSIC INC     |
|  ON 03/23/2005 BY: CERTIFIED MAIL.                                     |
|                                                                        |
|        CONCERNING: EMI MUSIC INC                                      |
|                    304 PARK AVENUE SOUTH                               |
|                    NEW YORK        ,NY  10010-0000                     |
|                                                                        |
|                                                                        |
|                                                                        |
|                                                                        |
|                                                                        |
|            DATE:03/31/2005   CLERK:PHILLIP BOWLING                     |
|                              COLBERT COUNTY COURTHOUSE                 |
|                              TUSCUMBIA   AL   35674                    |
|                              (256)386-8513                            |
|------------------------------------------------------------------------|
```

OPERATOR: PAW
PREPARED: 03/31/2005

9

AVS0702

CV 2005 000124. 00
HAROLD V. HUGHSTON,

```
|----------------------------------------------------------------------|
|                                                                      |
|            IN THE CIRCUIT  COURT OF  COLBERT     COUNTY               |
|                                                                      |
|  FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL     D003   |
|                                                                      |
|                                                                      |
|      HALL G RICK                        CASE NUMBER: CV 2005 000124 00|
|      ATTORNEY AT LAW                    PARTY NUMBER: C001            |
|      201 NORTH WATER STREET                                          |
|      TUSCUMBIA  AL   35674                                          |
|                                                                      |
|      YOUR ATTORNEY CODE IS HAL043                                    |
|                                                                      |
|  THE SUMMONS AND COMPLAINT          WAS SERVED ON EMI RECORDS         |
|  ON 03/23/2005 BY: CERTIFIED MAIL.                                   |
|                                                                      |
|      CONCERNING: EMI RECORDS                                        |
|                  304 PARK AVENUE SOUTH                               |
|                                                                      |
|                  NEW YORK      , NY  10010-0000                      |
|                                                                      |
|                                                                      |
|                                                                      |
|                                                                      |
|                                                                      |
|                                                                      |
|                                                                      |
|            DATE: 03/31/2005   CLERK: PHILLIP BOWLING                  |
|                               COLBERT COUNTY COURTHOUSE              |
|                               TUSCUMBIA  AL   35674                  |
|                               (256)386-8513                         |
|                                                                      |
|----------------------------------------------------------------------|
```

OPERATOR: PAW
PREPARED: 03/31/2005

10

AVS0702

ALABAMA JUDICIAL DATA CENTER
COLBERT       COUNTY
SERVICE NOTICE

---

IN THE CIRCUIT COURT OF COLBERT    COUNTY

FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL         DO02

HALL G RICK                          CASE NUMBER: CV 2005 000124 00
ATTORNEY AT LAW                      PARTY NUMBER: C001
201 NORTH WATER STREET
TUSCUMBIA  AL  35674

YOUR ATTORNEY CODE IS HAL043

THE SUMMONS AND COMPLAINT              WAS SERVED ON EMI GROUP INC
ON 03/23/2005 BY: CERTIFIED MAIL.

CONCERNING:  EMI GROUP INC
             304 PARK AVENUE SOUTH

             NEW YORK      , NY  10010-0000

DATE: 03/31/2005   CLERK: PHILLIP BOWLING
                    COLBERT COUNTY COURTHOUSE
                    TUSCUMBIA  AL   35674
                    (256) 386-8513

---

OPERATOR: PAW
PREPARED: 03/31/2005

11

ALABAMA JUDICIAL DATA CENTER
COLBERT         COUNTY
SERVICE NOTICE

CV 2005 000124. 00
HAROLD V. HUGHSTON,

IN. THE CIRCUIT COURT OF COLBERT    COUNTY

FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC. , ET AL          DOO6

HALL G RICK                          CASE NUMBER: CV 2005 000124 00
ATTORNEY AT LAW                      PARTY NUMBER: C001
201 NORTH WATER STREET
TUSCUMBIA  AL  35674

YOUR ATTORNEY CODE IS HAL043

THE SUMMONS AND COMPLAINT          WAS SERVED ON PEGASUS RECORDS
ON 03/30/2005 BY: PERSONAL SERVICE.

    CONCERNING: PEGASUS RECORDS
                612 E. TENNESSEE ST.

                FLORENCE     , AL  35630-0000

                DATE: 04/08/2005  CLERK: PHILLIP BOWLING
                                  COLBERT COUNTY COURTHOUSE
                                  TUSCUMBIA   AL   35674
                                  (256)386-8513

OPERATOR: PAW
PREPARED: 04/08/2005

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

    PLAINTIFFS,

VS.

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

    DEFENDANTS.

CASE NO. : CV-2005 _1246_

**RECEIVED**

**SUMMONS**

MAR 2 3 2005

**RONNIE MAY**
**SHERIFF, COLBERT COUNTY**

*46*

2005 MAR 18 PM [PHILLIP BO... CIRCUIT COUR...] FILED IN OF...

**NOTICE TO:**    Pegasus Records
                612 East Tennessee Street
                Florence, Alabama 35630

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH WATER STREET, TUSCUMBIA, ALABAMA74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

__X__    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama Rules of Civil Procedure: You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

____    This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of the Alabama Rules of Civil Procedure.

_3-21-05_        _Phillip Bowling_        By: _PB_
DATE             CLERK/REGISTER

RETURN ON SERVICE:

____    Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

____    I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama on (Date) _3-30-05_

_____
DATE

_____
SERVER SIGNATURE  _T Woods_

ADDRESS
OF SERVER _____

_____
Type of Process Server

12

ALABAMA JUDICIAL DATA CENTER
COLBERT     COUNTY
SERVICE NOTICE

CV 2005 000124. 00
HAROLD V. HUGHSTON,

IN THE CIRCUIT COURT OF COLBERT     COUNTY

FAME ENTERPRISES, ET AL  VS  CAPITOL RECORDS, INC., ET AL          DOO8

HALL G RICK                          CASE NUMBER: CV 2005 000124 00
ATTORNEY AT LAW                      PARTY NUMBER: COO1
201 NORTH WATER STREET
TUSCUMBIA  AL  35674

YOUR ATTORNEY CODE IS HAL043

THE SUMMONS AND COMPLAINT          WAS SERVED ON LASER'S EDGE
ON 03/29/2005 BY: PERSONAL SERVICE.

CONCERNING: LASER'S EDGE
            2825 18TH ST. SO.

            HOMEWOOD       , AL  35209-2509

DATE: 04/15/2005  CLERK: PHILLIP BOWLING
                  COLBERT COUNTY COURTHOUSE
                  TUSCUMBIA  AL   35674
                  (256)386-8513

OPERATOR: PAW
PREPARED: 04/15/2005

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

FAME ENTERPRISES, INC. and ROE E. (RICK) HALL,

    PLAINTIFFS,

VS.

    CASE NO.: CV-2005 _124A_

CAPITOL RECORDS, INC.; EMI GROUP, INC.; ET AL,

    DEFENDANTS.

**RECEIVED**

MAR 2 3 2005

RONNIE MAY
**SHERIFF, COLBERT COUNTY**

**SUMMONS**

**NOTICE TO:**    Laser's Edge    A 8
               2825 18th Street South
               Homewood, Alabama 35209

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE
ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER
A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT
TO THE PLAINTIFF'S ATTORNEY **G. RICK HALL** WHOSE ADDRESS IS **HALL & TANNER, P.C., 201 NORTH
WATER STREET, TUSCUMBIA, ALABAMA 74.**

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN **THIRTY (30) DAYS** AFTER THIS SUMMONS AND
COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR
THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF
YOUR ANSWER WITH THE CLERK OF THIS COURT.

  _X_   TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2 (b)(2) or 4.4 (b)(2) of the Alabama
       Rules of Civil Procedure: You are hereby commanded to serve this summons and a copy of the complaint in this action
       upon defendant.

  ___   This service by certified mail of this summons is initiated upon the written request of Plaintiff pursuant to Rule 4.1(c) of
       the Alabama Rules of Civil Procedure.

**3-21-05**        _Phillip Bowling_        By: _PW_
DATE               CLERK/REGISTER

RETURN ON SERVICE:

  ___   Certified mail return receipt received in this office on (Date) _____ (Return receipt hereto attached).

  ___   I certify that I personally delivered a copy of the Summons and Complaint to _Laser' Edge_ in
       _Jeff_ _Fred Assure_ County, Alabama on (Date) _3-29-05_ .

_____        _/s/ T Langross_
DATE                         SERVER SIGNATURE

ADDRESS
OF SERVER _____        _D. S._
_____        Type of Process Server